Anthony Rozelle BANKS,
Petitioner–Appellee,

v.

Dan M. REYNOLDS, Warden, Oklahoma State Penitentiary, McAlester, Oklahoma; Susan B. Loving, Attorney General of Oklahoma, Respondents–Appellants.

No. 94–5156.

United States Court of Appeals,
Tenth Circuit.

April 26, 1995.

Sandra D. Howard, Asst. Atty. Gen. (Susan B. Loving, Atty. Gen., with her on the brief), Oklahoma City, OK, for appellants.

James T. Priest, McKinney, Stringer & Webster, P.C., Oklahoma City, OK, for appellee.

Before MOORE, ANDERSON, and BALDOCK, Circuit Judges.

STEPHEN H. ANDERSON, Circuit Judge.

Anthony Rozelle Banks was convicted of first-degree murder for the 1978 shooting of David Fremin, and he presently is incarcerated at the Oklahoma State Penitentiary under a sentence of death. Mr. Banks filed this, his first federal habeas corpus petition, raising twenty-seven claims. The district court entered judgment in favor of Mr. Banks on three of these claims: (1) that the prosecution had suppressed exculpatory evidence in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); (2) that Mr. Banks received ineffective assistance from his trial counsel; and (3) that he received ineffective assistance from his appellate counsel.[1] The court ordered that Mr. Banks was to be retried within 120 days or the writ of habeas corpus would issue. The State has appealed.[2]

After careful review of the record in this case, we hold that the prosecution's failure to disclose material exculpatory evidence to the defense rendered the jury's verdict and death sentence constitutionally infirm. Accordingly, exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm.

## BACKGROUND

On April 11, 1978, David Fremin, the night clerk at a Git–N–Go convenience store in Tulsa, Oklahoma, was shot and killed during an armed robbery. Approximately one week later, a preliminary information was filed against Terrence Wallace Dean, and he was arrested for the crime. Two witnesses, William Gullick and Thomas Landsaw, identified Dean, through a photographic lineup, as having been in the store just prior to the murder.[3]

On May 31, 1978, the charges against Dean were dropped and an indictment was obtained against another man, Norman Lee Hicks. Hicks' name had been inserted as the payee on one of the money orders taken in

---

1. Because the court disposed of Mr. Banks' petition on these grounds, the court did not reach most of the remaining claims. The court did, however, address his contention that Oklahoma's "continuing threat" aggravating factor is facially unconstitutional. R.Vol. I, Doc. 39 at 14–15. That issue is not before us.

2. The district court granted the State's motion to stay the judgment "pending the resolution of this matter on appeal." *See* R.Vol. I, Doc. 41.

3. Mr. Landsaw testified that he was in the store at approximately 2:45 a.m. and Mr. Gullick testified to having been in the store a few minutes later. R.Vol. II, Hicks Prelim. at 5, 28. A silent alarm, activated by the removal of the last bill from the cash register, was received by the Tulsa police at approximately 2:52 a.m. R.Vol. II, Trial Tr. at 8.

the Git–N–Go robbery. At the preliminary hearing, Gullick and Landsaw both testified that they had misidentified Dean as the individual they had seen in the store the morning of the murder, and that it had in fact been Hicks whom they had witnessed.[4] In addition, Wayne Conn testified that Hicks had confessed the crime to him while the two were in jail together. Following the preliminary hearing, Hicks was bound over for trial on the first-degree murder charge. Several months later, however, the State amended the indictment to possession of a forged instrument and dropped the first-degree murder charge. Hicks pled guilty to the forgery charge. Throughout the proceedings, Hicks was represented by Leslie Earl, an attorney with the Tulsa County Public Defender's Office.

On November 7, 1979, eighteen months after the crime, while in the Tulsa County jail on an unrelated charge, Anthony Banks gave a recorded statement to a Tulsa County assistant district attorney, Ron Shaffer, implicating Billy James McClure as the individual who had murdered David Fremin.[5] During the course of this statement, Mr. Banks acknowledged his own presence at the scene of the crime, but denied any involvement in the robbery or the murder. Two days later, Anthony's brother, Walter Thomas Banks, also gave a statement to the district attorney's office implicating McClure. The State filed murder charges against McClure on November 14, 1979.

The information was amended on July 29, 1980, to include charges against Anthony and Walter Banks, as codefendants in the Fremin murder. On September 9, 1980, following a preliminary hearing, Anthony and Walter Banks were bound over for trial. The court granted a demurrer with respect to McClure, however, finding insufficient evidence to bind

him over. R.Vol. II, Banks Prelim. at 197–98.

The Tulsa County Public Defender's Office had been appointed to represent both Anthony and Walter Banks. However, because of a conflict of interest, the office withdrew as counsel to Walter. He was represented at trial by Howard Sell, a private Tulsa attorney. Anthony Banks was represented by Leslie Earl, the same public defender who previously had represented Norman Hicks on the Fremin murder charge.

During pretrial discovery, defense counsel sought from the Tulsa County District Attorney's Office and the Tulsa Police Department any materials "which could reasonably affect the determination of the Defendant's guilt or innocence ... whether or not the State feels the material is exculpatory in nature." R.Vol. II, Motion to Produce (Sept. 12, 1980) at 1. At a motion hearing, in response to defense counsel's inquiry as to whether all exculpatory or mitigating evidence had been turned over, the prosecuting attorney responded, "I do not know of anything in my file that would mitigate punishment that they [defense counsel] don't already have." R.Vol. II, Motion Hearing (Feb. 9, 1981) at 8.

Notwithstanding the request from defense counsel and the affirmative representations of the prosecuting attorney, the prosecution failed to disclose any information regarding the prior arrests of Dean and Hicks, the eye witness accounts, the testimony of Wayne Conn that Hicks confessed the crime to him, the fact that Hicks had been bound over for the Fremin murder on a finding of probable cause, or Hicks' guilty plea on the possession of a forged instrument charge.

Anthony and Walter Banks were tried in February 1981. The following evidence was presented at trial:

---

4. Although he did not testify at the preliminary hearing, the preliminary information filed against Hicks listed Michael Wayne Ganner as a prosecution witness. According to the district attorney's file, Mr. Ganner reported having been in the Git–N–Go shortly before the murder and having seen three black males in the store. Although Mr. Ganner was unable to identify Norman Hicks as one of the individuals he had seen, police records reflect that he was able to identify two "associates" of Hicks, Frankie Jones and

Richard Lee Briggs. *See* R.Vol. II, Hicks File (Prosecution Report).

5. Mr. Banks testified that the reason he came forward with the information was because "it's common knowledge in the jail system that if you have some knowledge of a crime that some deals can be made if you testify in another case; you can get leniency on what you are arrested for." R.Vol. II, Trial Tr. at 194–95.

(1) Traci Banks, who had been Anthony Banks' girlfriend at the time of the murder [6] and who had been living with him at Walter's apartment, testified that at approximately 3:00 a.m. on the morning of April 11, 1978, Anthony, Walter, and a friend, Val Gene Hicks,[7] had left the apartment to "go do something" at the Git–N–Go store on 64th and Peoria. R.Vol. II, Trial Tr. at 126. She testified that Anthony and Walter returned at approximately 5:00 a.m. and that Anthony had with him a small brown box containing paper money, coins, food stamps, money orders, and a wallet belonging to David Fremin. Id. at 128–29. She testified that she took note of Mr. Fremin's age, twenty-one, because he "had just had a birthday in February." Id. at 140.

Ms. Banks testified that Anthony told her he and Walter had robbed the Git–N–Go. According to her account, Walter kept watch outside while Anthony went in, robbed the store, and shot Mr. Fremin. She testified that Anthony told her he shot Fremin because he wanted to avoid being identified. Id. at 130–31. Finally, Traci testified that Anthony and Walter left at approximately 5:30 a.m. to go to "the north side" in order to dispose of the brown box, money orders, and wallet. Id. at 131–32.

(2) Walter Banks testified that he and Anthony had left the apartment at approximately 2:00 a.m. in order to take Val Gene Hicks to his apartment. He disputed Ms. Banks' testimony that he and Anthony had discussed going to the Git–N–Go store, however. Walter testified that after the two men dropped Hicks off at his apartment, Anthony told him that he intended to "make some kind of hustle," which Walter took to mean steal some money. Id. at 275, 298. Walter claimed that he did not want to be involved and that he, therefore, had Anthony drop him off at his girlfriend's apartment.[8] According to Walter, Anthony returned approx-

imately thirty minutes later, at which time the two of them returned to Walter's apartment. Although he testified that he observed a brown paper sack and a tray in the back seat of the car, Walter claimed he and Anthony did not discuss the items or where Anthony had obtained them. Walter stated that upon return to the apartment, he observed Traci and Anthony counting money. Again, however, Walter claimed that he made no inquiry regarding the money.

(3) Robert Yerton, a fingerprint expert, testified that eighteen latent prints had been lifted from the crime scene. Of those, one palm print, lifted from the counter at the convenience store, was identified as belonging to Anthony Banks.

(4) Anthony Banks testified in his own behalf, relating the same story he previously had told police. He testified that at approximately 2:15 a.m. on the morning of April 11, he and Walter took Val Gene Hicks home. Afterwards, they stopped at the Git–N–Go, a store that Anthony claimed he frequented, in order to get some beer and a sandwich. He claimed that as he stood at the counter talking to Fremin, whom he had known for some time, Billy McClure entered the store carrying a handgun and motioned for Anthony and Walter to leave.[9] He testified that as they were exiting the store, they heard a gunshot. McClure then came out of the store carrying the cash drawer and forced the Banks brothers, at gunpoint, to drive him to north Tulsa, where McClure got out and the Banks brothers drove on. Anthony testified that a few days later, as he and Walter cleaned out the car, they found some money orders, apparently left by McClure, which Anthony took to Norman Hicks. Hicks was going to pass the money orders and split the proceeds with Anthony.

---

6. Traci and Anthony subsequently were married. At the time of trial, however, they were divorced.

7. The record is unclear as to this·individual's actual name. He is on occasion referred to as Val Gene Hicks, while at other times he is referred to as Val Gene Daniels.

8. This apartment was approximately six blocks from Walter's apartment. Walter's girlfriend, Becky, was not at her apartment however. She was asleep at Walter's apartment. R.Vol. II, Trial Tr. at 275–76.

9. Anthony testified that he knew McClure from prison, but that he had not seen him in over a year. R.Vol. II, Trial Tr. at 189–91.

Following eight hours of deliberation, the jury found both Anthony and Walter guilty of first-degree murder. During the penalty phase of the trial, the jury found three statutory aggravating factors against Anthony Banks: (1) he had previously been convicted of a violent felony involving the use or threat of violence to the person; (2) the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution; and (3) the existence of a probability that he would commit criminal acts of violence that would constitute a continuing threat to society. R.Vol. II, Trial Tr. at 448–49. The jury fixed punishment for Anthony Banks at death. The jury fixed punishment for Walter Banks at life imprisonment.

On direct appeal, both Anthony and Walter were represented by Steve Lowery, an attorney with the Tulsa County Public Defender's Office. Mr. Banks' conviction was affirmed. *Banks v. State,* 701 P.2d 418 (Okla.Crim.App. 1985). Mr. Banks then filed his first application for post-conviction relief in state court, still represented by Mr. Lowery. The court denied post-conviction relief, and the court of criminal appeals affirmed. *Banks v. State,* No. PC–86–765 (Okla.Crim.App.1989).

In 1989, Mr. Banks, represented by Jim T. Priest, his current counsel, moved to strike the first application for post-conviction relief. He also filed a second amended application for post-conviction relief, raising twenty-nine claims. For the first time, Mr. Banks claimed that the prosecution had withheld exculpatory information in violation of *Brady,* and that he had received ineffective assistance from his trial counsel. Mr. Banks claimed that his failure to raise these claims on direct appeal was due to ineffective assistance of appellate counsel.

The state district court denied both his motion to strike and his application for post-

conviction relief. The court of criminal appeals affirmed, *Banks v. State,* 810 P.2d 1286 (Okla.Crim.App.1991), concluding that Mr. Banks had failed to establish adequate cause for his failure to raise nineteen of his claims on direct appeal or in his first application for post conviction relief.[10] The court specifically addressed Mr. Banks' contention that ineffective assistance of appellate counsel had "caused" his default, finding that Mr. Lowery provided constitutionally effective assistance on direct appeal. *Id.* at 1297.

Having exhausted his state court remedies,[11] Mr. Banks filed the instant petition for a writ of habeas corpus. The federal district court held an evidentiary hearing on Mr. Banks' ineffective assistance of counsel claims and the *Brady* claim. Among those testifying on Mr. Banks' behalf were Leslie Earl and Frank McCarthy, Mr. Banks' trial counsel; Jonnie O'Neal, another attorney in the public defender's office at the time of Mr. Banks' trial; and Don Ed Payne, a former district attorney who testified as an expert on attorney ineffectiveness. Jerry Truster, the prosecuting attorney in Mr. Banks' case, testified for the State.

Mr. Earl testified that at the time he represented Anthony Banks, he had no recollection of his prior representation of Norman Lee Hicks. Mr. McCarthy and Mr. O'Neal also testified that they had no knowledge of the Dean/Hicks information at the time of the Banks trial. All three testified that, given the work load of each public defender at the time (350–400 cases per attorney per year), it would not have been unusual for an attorney in the public defender's office to have forgotten the name of a person he or she previously had represented at a preliminary hearing.

The district court found that, at the time of the Banks trial, Mr. Earl did not have any

---

10. The court of criminal appeals held that most of the claims, including Mr. Banks' *Brady* claim and his ineffective assistance of counsel claim, were barred because they were not raised on direct appeal. *Banks v. State,* 810 P.2d 1286, 1289, 1297 (Okla.Crim.App.1981). The court held that Mr. Banks' incomplete appellate record claim normally should be raised in the first application for post-conviction relief. The court noted, however, that "in this case where appellate counsel also filed the first application for post-

conviction relief, we find that it is unreasonable to impose the waiver doctrine." *Id.* at 1289 n. 2.

11. "A habeas petitioner who has defaulted his federal claims in state court meets the technical requirements for exhaustion; there are no state remedies any longer 'available' to him." *Coleman v. Thompson,* 501 U.S. 722, 732, 111 S.Ct. 2546, 2555, 115 L.Ed.2d 640 (1991).

knowledge of his prior representation of Norman Lee Hicks, nor was it reasonable to expect that he would have remembered representing Hicks. The court concluded that exculpatory evidence had been suppressed by the prosecution in violation of *Brady*. The court also concluded that Mr. Banks received ineffective assistance from both his trial and appellate counsel and that his claims were not procedurally barred. Accordingly, the court ordered the writ of habeas corpus to issue unless the State retried Mr. Banks within 120 days.

## DISCUSSION

The State initially argues that the district court erred in reaching the merits of Mr. Banks' *Brady* and ineffective assistance of trial counsel claims because, according to the State, these claims are procedurally barred. As to Mr. Banks' substantive claims, the State argues that the prosecution did not have a duty under *Brady* to disclose the Dean/Hicks information because Mr. Banks' counsel either knew, or should have known, about the evidence. The State claims, in any event, that the evidence was not "material" under *Brady*. With respect to the ineffective assistance claims, the State argues that, in analyzing counsel's effectiveness, the district court failed to properly apply the standard established under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). We address each of these issues in turn.

## I. Procedural Bar

The State argues that Mr. Banks' *Brady* and ineffectiveness claims are procedurally barred because he failed to raise these issues on direct appeal. Thus, according to the State, these issues "can only be considered on habeas review if Petitioner demonstrates cause and prejudice for his failure to raise the issue[s]." Appellant's Br. at 33.

In *Coleman v. Thompson*, 501 U.S. 722, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991), the Supreme Court made it explicit that

> [i]n all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Id.* at 750, 111 S.Ct. at 2565.

Under Oklahoma law, "[m]atters which have or could have been raised on direct appeal but were not will not be considered in post-conviction proceedings." *Fisher v. State*, 845 P.2d 1272, 1274 (Okla.Crim.App. 1992). In this case, the Oklahoma Court of Criminal Appeals held that by failing to raise his *Brady* and ineffectiveness claims on direct appeal, Mr. Banks waived collateral review of those issues. *Banks v. State*, 810 P.2d 1286, 1289 n. 2, 1297 (Okla.Crim.App. 1991). Thus, the procedural bar applied by the court of criminal appeals clearly was an "independent" state ground as it was the exclusive basis for the state court's holding. *See Brecheen v. Reynolds*, 41 F.3d 1343, 1363 (10th Cir.1994); *Steele v. Young*, 11 F.3d 1518, 1521 (10th Cir.1993). We need not decide whether the procedural bar was "adequate,"[12] however, because we hold that Mr. Banks has, in any event, established "cause" for any procedural default and he has demonstrated actual "prejudice" as a result. *See United States v. Cook*, 45 F.3d 388, 392–96 (10th Cir.1995).

A habeas petitioner may establish cause for his procedural default by showing that he received ineffective assistance of counsel in violation of the Sixth Amendment. *Murray v. Carrier*, 477 U.S. 478, 488–89, 106 S.Ct. 2639, 2645–46, 91 L.Ed.2d 397 (1986); *Cook*, 45 F.3d at 392; *see Hardiman v.*

---

12. The test for adequacy is whether the Oklahoma courts' "actual application of the particular procedural default rule to all 'similar' claims has been evenhanded 'in the vast majority' of cases," *Andrews v. Deland*, 943 F.2d 1162, 1191

(10th Cir.1991), *cert. denied*, 502 U.S. 1110, 112 S.Ct. 1213, 117 L.Ed.2d 451 (1992); that is, whether the rule has been "strictly or regularly followed." *Brecheen*, 41 F.3d at 1353; *see Klein v. Neal*, 45 F.3d 1395, 1397 (10th Cir.1995).

*Reynolds,* 971 F.2d 500, 505–06 (10th Cir. 1992).

■ "To establish a claim for ineffective assistance of counsel, a defendant must show that (1) his counsel's performance was constitutionally deficient, and (2) counsel's deficient performance was prejudicial." *Cook,* 45 F.3d at 392 (citing *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064); *see also United States v. Dixon,* 1 F.3d 1080, 1083 (10th Cir.1993). The performance and prejudice components of the *Strickland* analysis present mixed questions of law and fact which we review de novo. *Brecheen,* 41 F.3d at 1365–66.

■ When a habeas petitioner alleges that his counsel was ineffective for failing to raise an issue on appeal, we examine the merits of the omitted issue. *Cook,* 45 F.3d at 392–93; *Dixon,* 1 F.3d at 1083. Failure to raise an issue that is without merit "does not constitute constitutionally ineffective assistance of counsel," *id.* at 1083 n. 5, because the Sixth Amendment does not require an attorney to raise every nonfrivolous issue on appeal. *See Jones v. Barnes,* 463 U.S. 745, 751, 103 S.Ct. 3308, 3312–13, 77 L.Ed.2d 987 (1983). Thus, counsel frequently will "winnow out" weaker claims in order to focus effectively on those more likely to prevail. *Smith v. Murray,* 477 U.S. 527, 536, 106 S.Ct. 2661, 2667, 91 L.Ed.2d 434 (1986); *see Tapia v. Tansy,* 926 F.2d 1554, 1564 (10th Cir.), *cert. denied,* 502 U.S. 835, 112 S.Ct. 115, 116 L.Ed.2d 84 (1991). However, "an appellate advocate may deliver deficient performance and prejudice a defendant by omitting a 'dead-bang winner,' even though counsel may have presented strong but unsuccessful claims on appeal." *Cook,* 45 F.3d at 394–95 (citing *Page v. United States,* 884 F.2d 300, 302 (7th Cir.1989)).[13]

■ In this case, Mr. Banks' appellate counsel failed to raise either the *Brady* claim or the ineffective assistance of trial counsel claim on direct appeal.[14] These were not frivolous or weak claims amenable to being winnowed out of an otherwise strong brief. They were clearly meritorious.[15]

Mr. Lowery argued on direct appeal that Leslie Earl's prior representation of Norman Hicks presented a conflict of interest. *See Banks v. State,* 810 P.2d 1286, 1295 (Okla. Crim.App.1991). Thus, Mr. Lowery obviously was aware that Norman Hicks had been arrested for the Fremin murder and bound over for trial. Furthermore, the fact that Mr. Earl requested, but did not receive from the prosecution, any information relating to Hicks' arrest and bind over was "obvious from the trial record."[16] *Cook,* 45 F.3d at 394–95. Thus, viewed "'from the perspective of counsel at the time,'" *Brecheen,* 41 F.3d at 1365 (quoting *Porter v. Singletary,* 14 F.3d 554, 558 (11th Cir.1994), *cert. denied,* ——— U.S. ———, 115 S.Ct. 532, 130 L.Ed.2d 435 (1994)), it is clear that Mr. Lowery had available to him all information necessary to raise the *Brady* and ineffective assistance claims on direct appeal. By failing to do so, his

---

13. While we have not defined the phrase "dead-bang winner" with precision, we have concluded that it is an issue which is obvious from the trial record and one which probably would have resulted in a reversal on appeal. *Cook,* 45 F.3d at 394–95.

14. Mr. Banks has framed his *Brady* and ineffective assistance arguments before this court in the alternative. He argues that the State withheld exculpatory evidence in violation of *Brady.* Alternatively, he argues that if the State did not withhold the evidence, then his trial counsel was ineffective for failing to use the evidence in his defense. Under either analysis, our final inquiry is the same: has our confidence in the outcome been undermined? *See Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068 (ineffective assistance of counsel); *United States v. Agurs,* 427 U.S. 97, 104, 96 S.Ct. 2392, 2397–98, 49 L.Ed.2d 342 (1976) (*Brady* violation).

15. In arriving at this conclusion, we have avoided "'the distorting effects of hindsight.'" *Parks v. Brown,* 840 F.2d 1496, 1510 (10th Cir.1987) (quoting *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065).

16. Mr. Earl had requested any information "which could reasonably affect the determination of the Defendant's guilt or innocence," R.Vol. II, Motion to Produce (Sept. 12, 1980) at 1. While the prosecution's obligation to disclose exculpatory evidence is not dependent upon the defendant's request, *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383–84, 87 L.Ed.2d 481 (1985), Mr. Earl's request obviously was broad enough to encompass the Hicks information.

representation of Mr. Banks fell below "an objective standard of reasonableness." *Id.; see Osborn v. Schillinger,* 861 F.2d 612, 625 (10th Cir.1988).

Having determined that Mr. Lowery's performance was deficient, we now must consider whether Mr. Banks has shown prejudice as a result. Mr. Banks bears the burden of establishing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068; *Brecheen,* 41 F.3d at 1365; *Stafford v. Saffle,* 34 F.3d 1557, 1564 (10th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1830, 131 L.Ed.2d 751 (1995).

The question of "prejudice" in the context of an ineffective assistance claim necessarily requires a reviewing court to look at the merits of the underlying claim. *Dixon,* 1 F.3d at 1083. This places us in an awkward position. We must review the merits of Mr. Banks' claims in order to determine whether he received ineffective assistance from his appellate counsel. Assuming he demonstrates ineffective appellate assistance, his procedural default will be excused and we may then review the merits of his claims. *See Ruff v. Armontrout,* 993 F.2d 639, 641 (8th Cir.1993); *Hudson v. Whitley,* 979 F.2d 1058, 1064 (5th Cir.1992). Notwithstanding the apparent circularity of this review, our ultimate inquiry is central and straightforward: is our confidence in the outcome of Mr. Banks' conviction and sentence undermined by the fact that the Dean/Hicks information was not presented at trial, whether through prosecutorial nondisclosure or because of counsel's error. *See Murray,* 477 U.S. at 489, 106 S.Ct. at 2646; *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068; *United States v. Agurs,* 427 U.S. 97, 104, 96 S.Ct. 2392, 2397–98, 49 L.Ed.2d 342 (1976). As discussed more fully below, we answer this question affirmatively. Thus, we hold that Mr. Banks received constitutionally ineffective assistance from his appellate counsel and he has, therefore, sufficiently established prejudice so as to excuse his state procedural default. We turn now to the merits of his claims.

## II. Brady Claim

In *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87, 83 S.Ct. at 1196–97; *see Kyles v. Whitley,* —— U.S. ——, ——, 115 S.Ct. 1555, 1564, 131 L.Ed.2d 490 (1995); *United States v. Bagley,* 473 U.S. 667, 674, 105 S.Ct. 3375, 3379, 87 L.Ed.2d 481 (1985); *United States v. Robinson,* 39 F.3d 1115, 1118 (10th Cir.1994); *Bowen v. Maynard,* 799 F.2d 593, 602 (10th Cir.), *cert. denied,* 479 U.S. 962, 107 S.Ct. 458, 93 L.Ed.2d 404 (1986).

In order to establish a *Brady* violation, a habeas petitioner must show that: (1) the prosecution suppressed evidence; (2) the evidence was favorable to the accused; and (3) the evidence was material to the defense. *Fero v. Kerby,* 39 F.3d 1462, 1472 (10th Cir. 1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 2278, 132 L.Ed.2d 282 (1995); *United States v. DeLuna,* 10 F.3d 1529, 1534 (10th Cir. 1993). Whether the government was required to disclose certain evidence under *Brady* is a mixed question of law and fact which we review de novo. *United States v. Hughes,* 33 F.3d 1248, 1251 (10th Cir.1994); *Ballinger v. Kerby,* 3 F.3d 1371, 1375 (10th Cir.1993).

In reviewing Mr. Banks' *Brady* claim, we must bear in mind that the primary consideration under *Brady* is fairness. Thus, we "should affirm the federal district court only if 'the omission deprived the defendant of a fair trial.'" *Ballinger,* 3 F.3d at 1377 (Kelly, J., dissenting) (quoting *Agurs,* 427 U.S. at 108, 96 S.Ct. at 2399).

In this case, the State readily admits that it did not disclose the Dean/Hicks information to the defense. However, the State maintains that *Brady* only requires the prosecution to disclose information which is oth-

erwise unknown to the defendant.[17] Because Mr. Banks' trial counsel knew or should have known that Dean and Hicks previously had been arrested for the crime, the State maintains that the prosecution had no obligation to turn over the Dean/Hicks information. We disagree.

Whether the defense knows or should know about evidence in the possession of the prosecution certainly will bear on whether there has been a *Brady* violation. Obviously, if the defense already has a particular piece of evidence, the prosecution's disclosure of that evidence would, in many cases, be cumulative and the withheld evidence would not be material. *See Mustread v. Gilmore,* 966 F.2d 1148, 1152 (7th Cir.1992); *Hughes v. Hopper,* 629 F.2d 1036, 1040 (5th Cir.1980), *cert. denied,* 450 U.S. 933, 101 S.Ct. 1396, 67 L.Ed.2d 367 (1981).

■ However, the prosecution's obligation to turn over the evidence in the first instance stands independent of the defendant's knowledge. Simply stated, "[i]f the prosecution possesses evidence that, in the context of a particular case is obviously exculpatory, then it has an obligation to disclose it to defense counsel whether a general request is made or whether no request is made." *Smith v. Secretary of N.M. Dep't of Corrections,* 50 F.3d 801, 826 (10th Cir.1995); *see Bagley,* 473 U.S. at 682, 105 S.Ct. at 3383–84 (Blackmun, J.); *id.* at 685, 105 S.Ct. at 3385 (White, J.). In this case, the fact that defense counsel "knew or should have known" about the Dean/Hicks information, therefore, is irrelevant to whether the prosecution had an obligation to disclose the information. The only relevant inquiry is whether the information was "exculpatory." [18]

■ The prosecution is not required under *Brady* to "make a complete and detailed accounting to the defense of all police investigatory work on a case," *Moore v. Illinois,* 408 U.S. 786, 795, 92 S.Ct. 2562, 2568, 33 L.Ed.2d 706 (1972), nor must the prosecutor "disclose possible theories of the defense to a defendant." *United States v. Comosona,* 848 F.2d 1110, 1115 (10th Cir.1988). It must only disclose exculpatory evidence. The exculpatory nature of particular evidence, however, "can seldom be predicted accurately until the entire record is complete." *Agurs,* 427 U.S. at 108, 96 S.Ct. at 2399.

The prosecution will necessarily have to exercise some discretion in determining whether evidence in its possession is exculpatory, and therefore subject to disclosure under *Brady.* The prosecutor must exercise this discretion carefully, however, because he alone "can know what is undisclosed," and it is to he alone that we assign "the consequent responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of 'reasonable probability' is reached." *Kyles,* — U.S. at —, 115 S.Ct. at 1567. Moreover, given the prosecutor's unique role in our criminal justice system,[19] he must resolve close cases and "doubtful questions in favor of disclosure." [20] *Agurs,* 427 U.S. at 108, 96 S.Ct. at 2399; *see Kyles,* — U.S. at —, 115 S.Ct. at 1567.

This is not a close case. The State maintains that the Dean/Hicks evidence was not disclosed to Mr. Banks' defense counsel be-

---

**17.** *See Castleberry v. Crisp,* 414 F.Supp. 945, 948 (N.D.Okla.1976); *see also United States v. Meros,* 866 F.2d 1304, 1308 (11th Cir.), *cert. denied,* 493 U.S. 932, 110 S.Ct. 322, 107 L.Ed.2d 312 (1989). In *Meros,* the Eleventh Circuit established the rule that the prosecution has no obligation to turn over that evidence which the defense either possess or could obtain with reasonable diligence. *Id.*

**18.** The second *Brady* factor, whether the withheld evidence was "favorable" to the defense, is frequently cast as whether the evidence was "exculpatory." We consider these terms interchangeable. *See Smith,* 50 F.3d at 825–26 n. 37.

**19.** "[T]he prosecutor's role transcends that of an adversary" because the prosecutor, acting as a representative of the sovereign, has an obligation to ensure " 'not that it shall win a case, but that justice shall be done.' " *Bagley,* 473 U.S. at 675 n. 6, 105 S.Ct. at 3380 n. 6 (quoting *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935)); *Smith,* 50 F.3d at 823.

**20.** "[A] prosecutor anxious about tacking too close to the wind will disclose a favorable piece of evidence. This is as it should be." *Kyles v. Whitley,* — U.S. —, —, 115 S.Ct. 1555, 1568, 131 L.Ed.2d 490 (1995) (citations omitted).

cause it was not exculpatory.[21] The prosecution, however, had information that at least three men had been arrested for the crime that Mr. Banks was charged with having committed; two eye witnesses had reported seeing two black males in the store just prior to the crime, and both witnesses positively identified Norman Lee Hicks as one of these men; a third witness reported seeing three black males in the store shortly before the crime—a fact contradictory to the prosecution's theory that Mr. Banks entered the store alone; and Wayne Conn testified that Hicks had confessed the crime to him. This evidence would clearly tend to suggest that Mr. Banks was not the perpetrator of the crime. Thus, it was exculpatory[22] and the prosecution was obliged to disclose the information to the defense.

Even were we to adopt the State's position, that the prosecution has no duty to disclose information which the defense knows or reasonably should know about, we would still conclude that, in this case, the prosecution breached its duty under *Brady.* The district court specifically found that Leslie Earl did not have knowledge of his prior representation of Hicks at the time he represented Mr. Banks. R.Vol. I, Doc. 39 at 8–9. The court further found that, given the work load of the public defender's office, it was not unreasonable that Mr. Earl did not remember his prior representation. *Id.* at 9. Absent clear error, we accept the district court's findings of fact. *Thomas v. Kerby,* 44 F.3d 884, 886 (10th Cir.1995). Finding no error in this case, we accept the court's finding that Mr. Earl neither knew nor should have known about the withheld evidence. In short, the prosecution breached its obligation to disclose exculpatory evidence to the de-

fense. We now consider whether the withheld evidence was material.

█ "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley,* 473 U.S. at 682, 105 S.Ct. at 3383 (Blackmun, J., joined by O'Connor, J.); *Robinson,* 39 F.3d at 1118. A "reasonable probability" is a " 'probability sufficient to undermine confidence in the outcome.' " *Bagley,* 473 U.S. at 682, 105 S.Ct. at 3383 (quoting *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068).

█ In evaluating the materiality of withheld evidence, we do not consider each piece of withheld evidence in isolation. Rather, we review the cumulative impact of the withheld evidence; its utility to the defense as well as its potentially damaging impact on the prosecution's case. *Kyles,* —— U.S. at —— – ——, 115 S.Ct. at 1566–69. Furthermore, recognizing that, in the usual case, not "every item of the State's case" will be undercut if the *Brady* material is disclosed, *id.* at ——, 115 S.Ct. at 1574, we evaluate the materiality of withheld evidence in light of the entire record in order to determine if "the omitted evidence creates a reasonable doubt that did not otherwise exist." *Agurs,* 427 U.S. at 112, 96 S.Ct. at 2402; *Hughes,* 33 F.3d at 1252; *cf. United States v. Buchanan,* 891 F.2d 1436, 1441 (10th Cir.1989), *cert. denied,* 494 U.S. 1088, 110 S.Ct. 1829, 108 L.Ed.2d 958 (1990). "What might be considered insignificant evidence in a strong case might suffice to disturb an already questionable verdict." *Robinson,* 39 F.3d at 1119 (citing *Agurs,* 427 U.S. at 113, 96 S.Ct. at 2402).

---

21. According to the State, the evidence was not exculpatory because the murder charge against Norman Hicks had been dropped. R.Vol. IV at 193–94. Based on an assistant prosecuting attorney's "assumption" that Norman Hicks was not involved in the Fremin murder, *id.* at 194, and the prosecutor's belief that he had "the right defendant" in Anthony Banks, the decision was made that the Dean/Hicks information was not exculpatory and, therefore, not subject to disclosure. *Id.*

22. The State has steadfastly maintained that the information was not exculpatory and, therefore, not subject to disclosure. However, at oral argument, counsel for the State acknowledged that "if it were me, I would have turned it over. There is no doubt, I would have turned it over." It is well settled that "when the lawyer responds, he or she speaks for the client." *Taylor v. Illinois,* 484 U.S. 400, 418, 108 S.Ct. 646, 658, 98 L.Ed.2d 798 (1988). Thus, notwithstanding the State's vigorous argument to the contrary, counsel's response demonstrates something less than certitude on the subject.

■ Our materiality review does not include speculation. "The mere possibility that evidence is exculpatory does not satisfy the constitutional materiality standard." *United States v. Fleming*, 19 F.3d 1325, 1331 (10th Cir.), *cert. denied* — U.S. ——, 115 S.Ct. 93, 130 L.Ed.2d 44 (1994); *Ballinger*, 3 F.3d at 1377 (Kelly, J., dissenting); *see also Agurs*, 427 U.S. at 109–10, 96 S.Ct. at 2400–01. However, we do recognize that evidence in the hands of a competent defense attorney may be used "to uncover other leads and defense theories." *Bowen*, 799 F.2d at 612. Thus, we may draw reasonable inferences as to what those other lines of defense may have been.

In this case, while the testimony of Walter Banks and the latent palm print lifted from the Git–N–Go counter are corroborative, the State's case against Anthony Banks stands or falls on the testimony of his ex-wife, Traci Banks. She testified that he confessed the crime to her and she witnessed him counting the money taken in the robbery. This was, by far, the most damning evidence against Anthony Banks.

At trial, defense counsel vigorously cross-examined Traci Banks and, during his closing argument, attacked her credibility as a witness. Among the credibility issues highlighted by counsel were the following: At Mr. Banks' preliminary hearing, held in September of 1980, Ms. Banks testified that on the morning of the crime she had overheard Anthony and Walter discussing going out. R.Vol. II, Trial Tr. at 141. At trial, however, held five months later, she was able to recall that Anthony and Walter were discussing going out to "do something" at "the Git–N–Go Store at 64th and Peoria." *Id.* at 126. At the preliminary hearing, she testified that her conversation with Anthony (wherein he allegedly confessed the crime) had been held in February 1978. At trial, however, she testified that the conversation had taken place in April of 1978.[23] *Id.* at 140–41. At

the preliminary hearing, Ms. Banks testified that she could not recall the value of the food coupons taken, but at trial she was able to remember that the approximate value of the food coupons was one-hundred dollars.[24] At trial, Ms. Banks acknowledged that she did not remember testifying at the preliminary hearing held five months earlier. *Id.* at 140. Nevertheless, she could remember having seen David Paul Fremin's wallet almost three years prior, and she was able to recall his full name, that his birthday was in February, and that he had turned twenty-one just prior to the crime. *Id.* at 129. Ms. Banks' credibility is further undermined by the fact that she admitted being aware of a five-thousand dollar reward being offered by Git–N–Go for testimony in the Fremin murder.[25] *Id.* at 135.

While Ms. Banks was the key prosecution witness, Walter Banks also testified. Although his testimony was consistent with that of Traci Banks, the story that he recited to the jury was the fourth one he had told. Upon being brought into the Tulsa Police Department for questioning, he told investigators that he knew nothing of the Fremin murders. After being informed that he had failed a polygraph test, however, he changed that story, relating the same story that Anthony had told two days earlier. However, upon the officers' suggestion that his version was implausible, Walter changed his story yet again. R.Vol. II, Trial Tr. at 285–86. He gave a statement, which was recorded, stating that Billy McClure had been with him and with Anthony throughout the morning. He stated that he and Anthony had gone into the Git–N–Go to purchase food and beer while McClure waited in the car. To their surprise, McClure came into the store with a gun, robbed the store, and shot Fremin. He then had the Banks brothers drop him off in north Tulsa. R.Vol. II, Recorded Statement of Walter Banks (Nov. 9, 1979). Finally, Walter gave a fourth version. Facing a pos-

---

23. The Fremin murder occurred on April 11, 1978.

24. At trial, Russell Estes, the Tulsa area supervisor for Git–N–Go stores, testified that $91.44 in food stamps had been taken in the robbery. R.Vol. II, Trial Tr. at 47.

25. Although she initially denied any knowledge of the reward, upon further questioning she admitted that she was aware of the reward. R.Vol. II, Trial Tr. at 135.

sible death sentence, he testified at trial that his brother dropped him off and appeared later with the fruits of the robbery. *See* R.Vol. II, Trial Tr. at 283–87. According to Walter, however, the two brothers never discussed the crime, nor did Walter ever inquire as to where the money came from, nor did he receive any of the money. R.Vol. II, Trial Tr. at 276–82.

The State also introduced the latent palm print lifted from the crime scene and identified as belonging to Mr. Banks.[26] The print had been lifted from the check-out counter of the store. The record does not reveal whether the prints of Norman Lee Hicks were compared to the eighteen lifted from the crime scene.[27]

In short, the evidence against Anthony Banks was not overwhelming and it rested primarily on the shoulders of Traci Banks. Mr. Banks' defense was that Billy McClure had committed the crime. His only rebuttal to the State's case was his own incredible testimony that his prison acquaintance, Billy McClure, whom he had not seen in over a year, suddenly appeared out of the night, robbed the store, killed Mr. Fremin, carjacked Anthony and Walter Banks, and then disappeared again into the darkness. However, Mr. McCarthy testified at the federal hearing that, had the defense had the Dean/Hicks information, Mr. Banks would not have testified at all.[28] R.Vol. III at 29. Instead, the defense would have been that Norman Hicks committed the crime. *Id.* Significant evidence supports such a theory.

26. Mr. Banks testified that he frequently shopped at the Git–N–Go between January and the middle of March, 1978. R.Vol. II, Trial Tr. at 198–99.

27. The file marked "Norman Lee Hicks," and included as part of the appellate record, contains a copy of a fingerprint card dated May 20, 1976. R.Vol. II, Hicks File. We presume these fingerprints would have been available for comparison to the prints lifted from the Fremin crime scene.

28. Mr. Banks' recorded statement was introduced into evidence during the prosecution's case-in-chief through Ron Shaffer, Chief Prosecutor for the Tulsa County District Attorney's Office. R.Vol. II, Trial Tr. at 166. The State argues that a defense based on evidence that Hicks or Dean committed the crime would have been wholly inconsistent with Mr. Banks' recorded statement. While this is true, Mr. McCarthy testified at the federal hearing that he would

Both William Gullick and Thomas Landsaw testified at Hicks' preliminary hearing that they had seen two black males in the store, one of whom both witnesses identified as Norman Hicks.[29] In addition, a third witness, Michael Wayne Ganner, gave a statement to police that he had been in the Git–N–Go just before 3:00 a.m. and that he had seen three black males in the store. R.Vol. II, Norman Lee Hicks File. Although Mr. Ganner was unable to identify Norman Hicks as one of the men he had seen in the store that morning, he was able to identify two "associates" of Hicks, Frankie Jones and Richard Lee Briggs. *Id.* Thus, the collective testimony of these three witnesses could have placed Norman Hicks and two of his associates at the Git–N–Go only moments before the Fremin murder. The testimony also would have been directly contradictory of Traci Banks' testimony and the State's theory that Anthony went into the Git–N–Go alone while Walter Banks waited outside.[30]

Additional support for the theory that Hicks committed the crime is found in the testimony of Hicks' jail mate, Wayne Conn. Mr. Conn testified at Hicks' preliminary hearing that Hicks told him

> that him and two of his partners were out smoking and taking some Qualudin and that they came upon this Convenience Store, this Quick Trip[31] out on Sheridan

> . . . .

> . . . .

have reconciled Mr. Banks' inconsistent statement implicating McClure as "an attempt to get some slack cut on a prior robbery." R.Vol. III at 46.

29. At oral argument, the State represented that these two witnesses had recanted their identification of Hicks. However, we have been unable to locate support for this proposition in the record. Accordingly, we disregard it.

30. Traci Banks testified that Anthony went into the store while "Walter stayed outside and watched." R.Vol. II, Trial Tr. at 130.

31. From the frequent references in the record to the "Quick Trip," we take it that the Git–N–Go franchise is also known as Quick Trip.

[T]he best I can remember, he said that him and another guy entered the store, and then they left because of this youngster[32] who came out and then they went back, they went inside and one stayed outside and this other guy was in the store and that this kid that got shot he freaked and they grabbed the money and the money orders.

R.Vol. II, Hicks Prelim. at 58. This testimony, that at least two and perhaps three individuals had entered the store, would have been consistent with that of Landsaw, Gullick, and Ganner.

The State introduced no physical evidence linking Anthony Banks to the fruits of the crime. However, the money orders taken in the Git–N–Go robbery had been recovered bearing the name of Norman Lee Hicks. Handwriting analysis positively identified Hicks as the person who signed the money orders and he ultimately pled guilty to possession of a forged instrument. Undoubtedly, taken in combination with four witnesses who placed Norman Hicks at the crime scene, this evidence would have been highly significant.

Medical testimony established that Mr. Fremin died as the result of a .22 caliber gunshot wound to the head. R.Vol. II, Trial Tr. at 65–67. At trial, the State did not introduce a murder weapon or the results of any ballistics testing. However, approximately eight months after David Fremin was shot with a .22 caliber weapon, but prior to Anthony Banks' arrest, Norman Lee Hicks pled nolo contendere to first-degree manslaughter in the shooting death of Billie Ray Cochran.[33] This evidence, had it been presented to the Banks jury,[34] may have been viewed as linking Norman Hicks to the murder of David Fremin, casting further doubt on the guilt of Anthony Banks.

We do not sit to reweigh evidence, assess the credibility of witnesses, and decide whether the Dean/Hicks information establishes the guilt of Norman Hicks beyond a reasonable doubt or exonerates Anthony Banks. See Ballinger v. Kerby, 3 F.3d 1371, 1376 (10th Cir.1993). That is a decision left to the citizen jurors of the State of Oklahoma.

Our task is considerably more narrow. The test is "whether we can be confident that the jury would have returned the same verdict had the Brady violation not occurred." Bartholomew v. Wood, 34 F.3d 870, 874 (9th Cir.1994), petition for cert. filed, 63 U.S.L.W. 3644 (Feb. 14, 1995) (No. 94–1419); see Kyles, — U.S. —, —, 115 S.Ct. 1555, 1574 ("[T]he question is not whether the State would have had a case to go to the jury if it had disclosed the favorable evidence, but whether we can be confident that the jury's verdict would have been the same."). Admittedly, on the dispositive point, this is a close case. However, the four witnesses whose testimony would have implicated Norman Hicks, the physical evidence linking him to the crime, and the relative strength of the State's case against Anthony Banks, suggest the reasonable probability that the wrong man is to be executed.

"Our duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case." Burger v. Kemp, 483 U.S. 776, 785, 107 S.Ct. 3114,

---

**32.** Thomas Landsaw was eighteen at the time, William Gullick was sixteen. R.Vol. II, Hicks Prelim. at 6, 26.

**33.** A reading of the record suggests that Hicks used a small caliber handgun in the Cochran shooting. R.Vol. II, Hicks Prelim. (Nos. 78–3299, 78–3298). The precise caliber of weapon used, however, is not discernible from the record before us.

**34.** "To be material under Brady, undisclosed information or evidence acquired through that information must be admissible." United States v. Kennedy, 890 F.2d 1056, 1059 (9th Cir.1989) cert. denied, 494 U.S. 1008, 110 S.Ct. 1308, 108 L.Ed.2d 484 (1990); see Brady, 373 U.S. at 89–

90, 83 S.Ct. at 1197–98; United States v. Derr, 990 F.2d 1330, 1335–36 (D.C.Cir.1993); United States v. Phillip, 948 F.2d 241, 249–50 (6th Cir. 1991) cert. denied, 504 U.S. 930, 112 S.Ct. 1994, 118 L.Ed.2d 590 (1992); see also Trujillo v. Sullivan, 815 F.2d 597, 612 n. 8, 613 (10th Cir.), cert. denied, 484 U.S. 929, 108 S.Ct. 296, 98 L.Ed.2d 256 (1987). The State did not argue below, nor has it argued to this court, that the testimony of the witnesses, evidence relating to Hicks' manslaughter and forgery convictions, and evidence relating to the weapon used would not have been admissible at trial. In the absence of any argument to the contrary, therefore, we accept Mr. Banks' premise that this evidence would have been admissible.

3121, 97 L.Ed.2d 638 (1987); *see Kyles,* —— U.S. at ——, 115 S.Ct. at 1559–60. In this case, the State's suppression of exculpatory evidence deprived Mr. Banks of a fair trial and it has undermined our confidence in the jury's verdict and sentence. *See id.* at ——, 115 S.Ct. at 1565. Accordingly, we hold that the prosecution's failure to comply with the mandate of *Brady v. Maryland* and to disclose material exculpatory evidence violated Mr. Banks' constitutional right to due process.

Because the withheld evidence was exculpatory and material under *Brady,* the prosecution's failure to disclose it was harmful as a matter of law. *See Agurs,* 427 U.S. at 112, 96 S.Ct. at 2402. Thus, "there is no need for further harmless-error review." *Kyles,* —— U.S. at ——, 115 S.Ct. at 1566; *cf. O'Neal v. McAninch,* —— U.S. ——, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995); *Lockhart v. Fretwell,* —— U.S. ——, —— – —— n. 2, 113 S.Ct. 838, 842–43 n. 2, 122 L.Ed.2d 180 (1993).

Our disposition of this case on the *Brady* issue makes consideration of Mr. Banks' second proposition, that he received ineffective assistance from his trial counsel, unnecessary. We therefore do not address the issue.

The district court properly granted the petition for a writ of habeas corpus. The judgment of the district court is AFFIRMED. The stay previously entered in this case shall remain in effect until further order of the district court.