**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 4 1999**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

DANA DREW HAWKINS,

      Petitioner-Appellant,

v.

ROBERT D. HANNIGAN, and the
ATTORNEY GENERAL OF THE
STATE OF KANSAS,

      Respondents-Appellees.

No. 97-3326

---

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 94-3355-DES)**

---

David J. Gottlieb, Director, The Paul E. Wilson Defender Project, University of
Kansas School of Law, Lawrence, Kansas, for Plaintiff-Appellant.

Jared S. Maag, Assistant Attorney General, State of Kansas, Topeka, Kansas, for
Respondents-Appellees.

---

Before **SEYMOUR,** Chief Judge, **EBEL** and **KELLY**, Circuit Judges.

---

**EBEL**, Circuit Judge.

---

    Petitioner-Appellant Dana Drew Hawkins was convicted in 1984 of

aggravated battery, rape, and aggravated sodomy by a jury in Kansas.  He

exhausted his state remedies, and now appeals from the district court's order denying federal habeas relief under 28 U.S.C. § 2254. Hawkins claims that he was denied effective assistance of counsel at trial and on appeal, and that he was denied his right to confront and cross-examine the victim at trial. We exercise jurisdiction under 28 U.S.C. §§ 1291 & 2253 and affirm.

## FACTS

On March 26, 1983, during the early morning hours, a 92-year-old woman in Neodesha, Kansas, was beaten, orally sodomized, and raped in her home. The victim gave two audiotaped statements to police, but given her admittedly very poor hearing and eyesight, she was able to provide only a limited description of her attacker.

On March 27, as part of its investigation, police brought in approximately 100-150 people to be photographed, including petitioner-appellant Dana Hawkins. Hawkins was not a suspect at the time. However, two days later, on March 29, Hawkins was questioned briefly at the police station after a witness informed police that he had seen Hawkins near the victim's house the night of the crime.

Later that same evening, Hawkins' sister-in-law called police to say that Hawkins wished to make a further statement. The police brought Hawkins to the station, and at 10:30 p.m., Hawkins gave an audiotaped interview. During this interview, Hawkins claimed that an acquaintance, Robert Daugherty, had raped an

- 2 -

elderly woman and had asked Hawkins to be his lookout. The following day, March 30, Hawkins returned to the police station to provide a three-page written statement reiterating this version of events.

At 7:00 a.m. on March 31, Hawkins voluntarily accompanied police chief Wes Sade from Neodesha to Chanute, Kansas, in order to take a psychological stress evaluation ("PSE") test. At 9:30 a.m., after conducting the PSE, police gave Hawkins Miranda warnings and questioned him again. During this audiotaped interrogation in Chanute, Hawkins became upset and confused, and began to implicate himself in the crime. Hawkins admitted to entering the victim's residence and hearing screams, seeing Daugherty on top of the victim, and personally hitting the victim because her screaming made him panic. He admitted to drinking alcohol and smoking marijuana that night, and frequently stated that he could not remember what had happened.

After the morning interview, Hawkins either requested an attorney or asked Chief Sade whether he should have one. Questioning stopped at that time, and Chief Sade transported Hawkins back to Neodesha, where he was arrested for assault and conspiracy to commit a felony and burglary. After being processed at the Neodesha police department, Hawkins was taken to the county attorney's office. There he renewed his request for an attorney, but none was provided.

At the county attorney's office, police read Hawkins his <u>Miranda</u> rights and interrogated him again in two videotaped sessions. During the first videotaped session, from 2:00 p.m. to 3:15 p.m., police played back for Hawkins the audiotaped statement he had made in Chanute earlier that day. Chief Sade then used the rest of the same audiotape to record the remainder of the 2:00 p.m. videotaped interview. Thus, the audiotape contained both the 9:30 a.m. interview in Chanute and part of the 2:00 p.m. videotaped interview in Neodesha. This entire audiotape, containing both sessions, was played for the jury. The transcript of this audiotape, which appears in the trial record, does not clearly reflect at what point the morning interview ceased and the afternoon recording commenced. However, in the later portion of the audiotape, clearly part of the 2:00 p.m. session, Hawkins confessed to hitting and orally sodomizing the victim, but then subsequently recanted the latter admission.

The first videotaped session ended at 3:15 p.m., and Hawkins was taken to the scene of the crime. Police then returned Hawkins to the county attorney's office and began the second videotaped session at 4:00 p.m. This second videotaped session was played for the jury, but apparently it was later damaged or destroyed, and is no longer part of the state court record.

The following day, April 1, Chief Sade presented the victim with a photo lineup, and the victim identified Hawkins as her attacker. Unlike the victim's

- 4 -

other statements to police, her photo identification of Hawkins was not audiotaped.

In a pretrial motion, defense counsel moved to suppress Hawkins' videotaped statements[1] from March 31 in Neodesha. On October 25, 1983, the district court denied this motion, finding that even though Hawkins requested an attorney at least twice, the statements he made in Neodesha were given voluntarily.

On January 26, 1984, the opening day of Hawkins' trial, the parties submitted a stipulation permitting hearsay statements by the victim to be introduced at trial. The signed stipulation, which was read into the record, provided in part that

> either party may resort to hearsay evidence pertaining to <u>any description or identification</u> given by the victim Hazel Burton. Such hearsay description or identification may be submitted to the jury by <u>audio tape statements</u> taken from the victim Hazel Burton, <u>photos</u>, transcription of tapes, and by <u>eliciting hearsay testimony from Chief Wes Sade of the Neodesha Police Department</u>.
> This stipulation and agreement is entered into with full knowledge by all parties and with the understanding that the victim Hazel Burton is 92 years of age, in seriously poor health, and that her appearance in court could prove extremely hazardous to her life.
> This stipulation and agreement is further requested by both parties in that each feels and recognizes a degree of value in those descriptions or identifications relevant to their individual side of the case.

---

[1] Counsel's motion did not seek to suppress any of the audiotape recordings.

(Emphasis added.)

At trial, the victim's taped statements to the police, describing the incident and her attacker, were played for the jury. These statements conveyed the limitations of the victim's eyesight, hearing, and memory, and defense counsel did not object to their admission. However, defense counsel did object when Chief Sade testified that he had shown the victim a photo lineup, that "she looked at all of the pictures very carefully, and on that date, 4-1-83, at 5:10 p.m., she picked out Mr. Hawkins, and said it sure looked like him, and specifically pointed to his picture in the photograph line up." After discussing at sidebar the scope of the parties' stipulation, the trial court overruled defense counsel's objections.

In addition to Hawkins' videotaped statements made March 31 in Neodesha and the victim's photo identification of Hawkins (as presented through Chief Sade's hearsay testimony), the trial court also admitted, over defense counsel's objection, the transcript of Hawkins' testimony at a preliminary hearing in a separate action against Robert Daugherty, the man originally identified by Hawkins as responsible for the crime. At that hearing Hawkins admitted to being in the woman's house, but testified that Daugherty had raped the victim while he stood watch. Hawkins testified pursuant to a plea agreement under which the state agreed to drop all but the rape charges against Hawkins in exchange for his testimony against Daugherty. However, the plea agreement was later withdrawn

when the state determined that Hawkins' inculpation of Daugherty had been false and dropped its case against him.

All of Hawkins' audiotaped statements[2] were admitted at trial without objection, as was his three-page written statement to the police given on March 30. In addition, the government presented forensic evidence that head and pubic hairs found in the victim's bedding matched Hawkins' characteristics.[3] The state's expert admitted on cross-examination that the hair evidence was not conclusive, given his estimate that 30-35 people in Neodesha could have the same pubic hair characteristics. On redirect, he refused to estimate the number of people who might share the combined head and hair characteristics.

Hawkins did not testify at trial. His defense rested on alibi testimony and the suggestion that Daugherty had committed the crime.

Following the three-day trial, the jury convicted Hawkins of aggravated battery, rape, and aggravated sodomy. On February 29, 1984, he was sentenced to 5-20 years on the aggravated battery conviction, and 15 years to life on the rape and aggravated sodomy convictions.

---

[2]These were his March 29, 1983 statement at 10:30 p.m., given at the Neodesha Police station, and the audiotaped statement given March 31, which included both the 9:00 a.m. interview in Chanute and a portion of the 2:00 p.m. interview in Neodesha.

[3]The state's expert testified that the ratio of people with matching hair characteristics was 1/700 for the pubic hair and 1/4,500 for the head hair.

On April 5, 1985, the Kansas Supreme Court affirmed Hawkins'
convictions on direct appeal. The state court denied post-conviction relief under
Kan. Stat. Ann. § 60-1507, which the Kansas Court of Appeals affirmed on
February 7, 1992. Hawkins filed his petition for writ of habeas corpus under 28
U.S.C. § 2254 in August 1994, claiming that he was denied his right to effective
assistance of counsel and his right to confront and cross-examine the victim at
trial. The district court denied relief on September 30, 1997. See Hawkins v.
Hannigan, 979 F. Supp. 1397 (D. Kan. 1997). Hawkins now appeals.

## DISCUSSION

Because Hawkins' § 2254 petition was pending at the time the habeas
corpus statute was amended by the Antiterrorism and Effective Death Penalty Act
of 1996, Pub. L. No. 104-132, tit. I, § 104 (1996) ("AEDPA"), those amendments
do not apply to this case. See Lindh v. Murphy, 521 U.S. 320 (1997); Jackson v.
Shanks, 143 F.3d 1313, 1317 (10th Cir.), cert. denied, 119 S. Ct. 378 (1998). We
review the district court's legal conclusions de novo, and its factual findings for
clear error. See Cooks v. Ward, 165 F.3d 1283, 1287 (10th Cir. 1998). "[W]e
afford deference to the state court's construction of state law," and presume that
its factual findings are correct. See Jackson, 143 F.3d at 1317 (stating pre-
AEDPA standards).

- 8 -

On appeal, Hawkins raises two major issues:  ineffective assistance of trial and appellate counsel, and the denial of his right to confront and cross-examine the victim at trial.  For the reasons given below, we affirm the district court's denial of habeas relief.

## I. INEFFECTIVE ASSISTANCE OF COUNSEL

Hawkins asserts that he was denied effective assistance of counsel both at trial and on appeal (by the same attorney).  Specifically, Hawkins claims that:  1) counsel failed to appeal the admission of Hawkins' videotaped confession, which was obtained in violation of his Fifth Amendment right to counsel;  2) counsel stipulated at trial to the admission of the victim's hearsay statements, in violation of Hawkins' Sixth Amendment right of confrontation; 3) counsel failed to appeal the admission of the transcript of Hawkins' testimony given at Robert Daugherty's preliminary hearing, in violation of Hawkins' Fifth Amendment right against self-incrimination; 4) counsel failed to object at trial to a hearsay statement of an eyewitness who placed Hawkins near the scene of the crime, in violation of Hawkins' right of confrontation; and 5) counsel failed to raise Fourth Amendment challenges to Hawkins' initial detention (prior to his formal arrest).

A. Standard of Review

A claim of ineffective assistance of counsel is a mixed question of law and fact, which a federal habeas court reviews de novo.  See Williamson v. Ward, 110

F.3d 1508, 1513 (10th Cir. 1997). To prevail on his claims of ineffective assistance, Hawkins must meet the test established in Strickland v. Washington, 466 U.S. 668 (1984); that is, he must demonstrate that his counsel's performance was constitutionally deficient and that his counsel's deficient performance prejudiced the defense. See Strickland, 466 U.S. at 687; Boyd v. Ward, No. 98-6309, 1999 WL 370418, at *5 (10th Cir. June 8, 1999).

To prove that his counsel's performance was deficient, Hawkins must show that his counsel "committed serious errors in light of prevailing professional norms such that his legal representation fell below an objective standard of reasonableness." Duvall v. Reynolds, 139 F.3d 768, 776-77 (10th Cir.) (internal quotations omitted), cert. denied, 119 S. Ct. 345 (1998). Hawkins "must overcome a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance that might be considered sound trial strategy." Moore v. Reynolds, 153 F.3d 1086, 1096 (10th Cir. 1998) (citing Strickland, 466 U.S. at 689), cert. denied, 119 S. Ct. 1266 (1999). To establish that counsel's deficient performance was prejudicial, Hawkins must also show that, but for his counsel's errors, there is a reasonable probability that the outcome of the proceeding would have been different. See Duvall, 139 F.3d at 777.

The Strickland test also applies to assessing the effectiveness of appellate counsel. See United States v. Cook, 45 F.3d 388, 392 (10th Cir. 1995). When a habeas petitioner alleges that his appellate counsel rendered ineffective assistance by failing to raise an issue on direct appeal, we first examine the merits of the omitted issue. If the omitted issue is meritless, then counsel's failure to raise it does not amount to constitutionally ineffective assistance. See Parker v. Champion, 148 F.3d 1219, 1221 (10th Cir. 1998) (citing Cook, 45 F.3d at 392-93), cert. denied, 119 S. Ct. 1053 (1999). If the issue has merit, we then must determine whether counsel's failure to raise the claim on direct appeal was deficient and prejudicial. See Cook, 45 F.3d at 394. For example, counsel's failure to raise a "dead-bang winner" on appeal – an issue that is both obvious from the trial record, and one which would have resulted in reversal on appeal – constitutes ineffective assistance. See id. at 395. When counsel omits an issue under these circumstances, counsel's performance is objectively unreasonable because the issue was obvious from the trial record, and the omission is prejudicial because the issue warranted reversal on appeal. See id.

As discussed below, although we find that Hawkins' counsel committed errors that were deficient under Strickland, we conclude that these errors did not prejudice Hawkins' defense, and therefore hold that Hawkins was not deprived of his Sixth Amendment right to counsel.

B. Counsel's Alleged Errors

    1. The Videotaped Statements

Hawkins first claims that his appellate counsel was ineffective for failing to appeal the admission of Hawkins' two videotaped statements taken the afternoon of March 31, 1983 at the Neodesha county attorney's office, following Hawkins' requests for an attorney. In the first of these videotaped sessions, the partial audio-recording of which was played for the jury, Hawkins admits that he hit the victim and orally sodomized her. The second videotaped statement was also played for the jury, but its contents do not appear in the trial transcript.[4] Hawkins argues that the videotaped statements were obtained in violation of his Fifth Amendment right to counsel, and thus should have been excluded at trial.

Once an individual in custody invokes his right to an attorney, all questioning by law enforcement officers must cease until an attorney is present. See Miranda v. Arizona, 384 U.S. 436, 474 (1966); United States v. Roman-

---

[4]The trial transcript states:
> MR. SADE: In Kurt Kluin's office. The time now is 4:42 p.m. on the 31st day of March, 1983, and that will conclude the interview.
> (The video tape interview of Mr. Dana Hawkins was played to the jury; thereafter upon transcription, said tape contained only the above statement by Mr. Wes Sade. The balance of the tape contained no video or audio recordings, except a video tape interview of Mr. Robert Daugherty. . . .)

Zarate, 115 F.3d 778, 782 (10th Cir. 1997); United States v. Giles, 967 F.2d 382, 385 (10th Cir. 1992). Moreover, when "'an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights.'" Giles, 967 F.2d at 385 (quoting Edwards v. Arizona, 451 U.S. 477, 484 (1981)). "[A]n accused . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." Edwards, 451 U.S. at 484-85.

Hawkins contends that he requested counsel three times prior to the interviews depicted in the challenged videotapes: after the audiotaped interview in Chanute on the morning of March 31; in the car on the way back from Chanute to Neodesha after being placed under arrest; and again at the county attorney's office in Neodesha, just prior to being questioned on videotape. At Hawkins' state collateral review hearing, Chief Sade acknowledged that Hawkins "made some type of mention about an attorney" following the morning interview in Chanute. However, Sade testified that Hawkins initiated conversation in the car on the way back to Neodesha, asking Sade what he thought might happen to him, and if he would be sent to a mental institution. Sade further stated that he did not

- 13 -

recall whether Hawkins requested a lawyer at the Neodesha county attorney's office.

On state collateral review, the Kansas Court of Appeals acknowledged the trial court's finding that Hawkins renewed his request for counsel in Neodesha. The court of appeals concluded that the statements taken at the county attorney's office should have been suppressed because the police initiated interrogation after Hawkins had renewed his request for counsel. However, the court ultimately ruled that the failure to raise the issue on direct appeal did not constitute ineffective assistance of counsel, as Hawkins had failed to establish prejudice under Strickland.

In reviewing this claim of ineffective assistance in Hawkins' § 2254 petition, the federal district court opined that had Hawkins' counsel directly appealed the admission of the recorded statements, the issue would have required examination under both Edwards and Oregon v. Bradshaw, 462 U.S. 1039, 1043-46 (1983) (holding that a defendant's inquiry as to what might happen to him "initiated" conversation with police, triggering the exception to the Edwards rule). See Hawkins, 979 F. Supp. at 1403. However, the district court concluded that "[w]hile the issue had obvious merit and should have been raised, given the competing Supreme Court authorities at the time of petitioner's trial and the absence of the challenged videotaped statements, this court is unable to find that

- 14 -

petitioner's state court appeal would have resulted in a reversal of petitioner's conviction." Id. at 1403.

By its reference to Bradshaw, it appears that the district court was concerned with the implications of Hawkins' having possibly reinitiated discussions with the police during the trip back to Neodesha. The district court's concern is misplaced, however. The Kansas Court of Appeals found that Hawkins requested counsel again just prior to questioning in Neodesha, a finding entitled to a presumption of correctness. See Strickland, 466 U.S. at 698 ("[S]tate court findings of fact made in the course of deciding an ineffectiveness claim are subject to the deference requirement of § 2254(d) . . . ."). Thus, even if Hawkins did initiate conversation with Chief Sade in the car on the trip back to Neodesha, his subsequent request for counsel at the county attorney's office renders Edwards, not Bradshaw, controlling of these facts. Under Edwards, Hawkins' statements at the county attorney's office in Neodesha were obtained in violation of Hawkins' right to counsel and should have been suppressed. Therefore, as constitutional error, the right to counsel issue indeed had "obvious merit," and counsel's failure to raise the issue on appeal constituted deficient performance. Furthermore, the error may have warranted reversal on direct appeal. See Giles, 967 F.2d at 385-86 (10th Cir. 1992) (reversing federal conviction on direct appeal

- 15 -

for Edwards violation); United States v. Kelsey, 951 F.2d 1196, 1198-1200 (10th Cir. 1991) (same).

Because the question of whether counsel's deficient performance was prejudicial under Strickland requires an examination of the trial record as a whole, we turn to the other alleged errors in representation before undertaking this inquiry.

2. The Pre-Trial Stipulation

Hawkins next claims that his counsel's stipulation to the admission of hearsay evidence, which allowed into evidence the victim's identification of Hawkins through Chief Sade's testimony, violated Hawkins' Sixth Amendment right of confrontation. Hawkins contends that counsel mistook the scope of the stipulation, especially regarding the victim's identification of Hawkins from a photographic lineup as introduced through the hearsay testimony of Chief Sade. As a result, Hawkins claims that his counsel did not understand what he was agreeing to, such that Hawkins, as his client, cannot be said to have made a knowing and voluntary waiver of his confrontation rights.

The Confrontation Clause provides that in all criminal prosecutions, "the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. There is no doubt that a defendant may waive this right. See Brookhart v. Janis, 384 U.S. 1, 4 (1966). However, because there is a

presumption against the waiver of constitutional rights, see id., for a waiver to be effective it must be clearly established that there was "'an intentional relinquishment or abandonment of a known right or privilege.'" See id. (quoting Johnson v. Zerbst, 304 U.S. 458, 464 (1938)).

On direct review, the Kansas Supreme Court held that the stipulation, which was signed by both Hawkins and his lawyer and which was read and reviewed by the trial court in Hawkins' presence, reflected Hawkins' valid consent to the admission of the evidence covered by the stipulation. However, on state collateral review, the Kansas Court of Appeals observed that nothing in the record beyond the stipulation itself indicated that Hawkins knew or understood that he had a constitutional right to confront his accuser, or that by signing the stipulation, he was waiving that right. Moreover, the court of appeals found that the state failed to meet its burden under Boykin v. Alabama, 395 U.S. 238, 244 & n.7 (1969), to insure that the record reflected a valid waiver. The court thus concluded that there was no valid waiver by Hawkins, and consequently, the hearsay testimony of the victim's account of the attack and her identification of the attacker was admitted in violation of Hawkins' right to confront his accuser. Nevertheless, the court of appeals ruled that counsel was not ineffective, as counsel's decision to enter the stipulation was a matter of reasonable trial strategy.

On federal habeas review, the district court agreed that the stipulation reflected a reasonable strategic decision not to have the elderly victim testify at Hawkins' jury trial. The court reasoned that defense counsel's apparent surprise at the scope of the stipulation simply indicated counsel's mistaken assessment of the risk in his strategy of keeping the victim off the stand. See Hawkins, 979 F. Supp. at 1402. The court concluded that in any event, Hawkins could not establish prejudice under Strickland, in light of the other evidence before the jury.

The precise issue before us is whether Hawkins' counsel, by stipulating to the admission of hearsay evidence, properly waived his client's constitutional confrontation rights. This issue was addressed in United States v. Stephens, 609 F.2d 230 (5th Cir. 1980). In Stephens, the appellants had been charged along with five other individuals in a multi-count indictment, and the court ordered appellants' trial to be severed from their codefendants. See id. at 231. At appellants' bench trial, defense counsel stipulated to the admission of the transcript from the codefendants' trial in exchange for the government's agreement to drop all but one of the substantive counts against the appellants. See id. at 231-32. Appellants argued that counsel's stipulation effectively denied them their Sixth Amendment right of confrontation. See id. at 232. The Fifth Circuit rejected the argument and held that "counsel in a criminal case may waive his client's Sixth Amendment right of confrontation by stipulating to the

admission of evidence, so long as the defendant does not dissent from his attorney's decision, and so long as it can be said that the attorney's decision was a legitimate trial tactic or part of a prudent trial strategy." Id. at 232-33. The Fifth Circuit's holding in Stephens comports with decisions of the First and Ninth Circuits. See Cruzado v. People of Puerto Rico, 210 F.2d 789, 791 (1st Cir. 1954) ("[W]here an accused is represented by counsel, we do not see why counsel, in his presence and on his behalf, may not make an effective waiver of [the right of confrontation]."); Wilson v. Gray, 345 F.2d 282, 286 (9th Cir. 1965) ("[T]he accused may waive his right to cross examination and confrontation and . . . the waiver of this right may be accomplished by the accused's counsel as a matter of trial tactics or strategy.").[5]

Here, there is no evidence that Hawkins disagreed with or objected to his counsel's decision. Furthermore, we find that counsel's decision to enter the stipulation was a matter of prudent trial strategy. The live testimony of a frail, elderly rape victim could have been extraordinarily damaging to the defense. We believe that most competent attorneys would have made the decision to enter the

---

[5]Cruzado points out that defense counsel may regularly choose to forego cross examination of a government witness or to limit that cross examination. See Cruzado, 210 F.2d at 791. That also is an effective waiver of the defendant's right of confrontation which is valid if done pursuant to a reasonable trial strategy in defendant's presence, and without defendant's objection thereto, without requiring proof of defendant's knowing and express consent.

stipulation to keep her off the stand.   Defense counsel's protestations[6] when

Chief Sade testified to the victim's identification of Hawkins ring hollow, given

the clear language of the stipulation.[7]  Even assuming that Hawkins' counsel was

confused and that, notwithstanding the clear language of the stipulation, he never

intended to agree to permit Chief Sade to give hearsay testimony of the victim's

identification of Hawkins, we still find that the reasons for entering the

stipulation far outweigh any reason not to enter it; certainly most reasonable

counsel would not have opted to put the victim on the stand just to avoid the

hearsay testimony of Chief Sade, especially given that the victim could have made

an in-court identification of Hawkins.   In short, we find that counsel's decision

to enter the stipulation was, under the circumstances, an eminently prudent trial

decision.[8]   In light of this finding and the fact that the record reflects no dissent

_____

[6]Defense counsel objected to Chief Sade's hearsay testimony regarding the victim's photo identification of Hawkins, saying:

> Everything else she has said to me has been on tape, and there have been written statements that I have read on these tapes.  They have been transcribed and given to me, and not anything else that she has said I don't know.  I would point out that if she identified him in response to, is this the guy that you saw, I would object to that.  I had seen all of these other statements before.

[7]The stipulation expressly permitted "any description or identification given by the victim" as introduced through, inter alia, "hearsay testimony from Chief Wes Sade of the Neodesha Police Department."

[8]In any event, any error by counsel was not prejudicial:  the stipulation did

(continued...)

from Hawkins as to counsel's decision, we hold that counsel effectively waived Hawkins' confrontation rights.

Because counsel's sound strategic trial decision did not unconstitutionally deprive Hawkins of his right of confrontation, we hold that counsel's performance, with respect to his decision to enter the stipulation, was not deficient under Strickland.

3. The Preliminary Hearing Testimony

Hawkins next contends that counsel was ineffective in failing to appeal the introduction at trial of statements Hawkins had made at Robert Daugherty's preliminary hearing. Hawkins argues that the state obtained his preliminary hearing testimony in exchange for a promise of leniency (which the state later withdrew). As such, Hawkins claims that his statements were neither free nor voluntary, and their admission into evidence at his trial violated his Fifth Amendment right against self-incrimination. Hawkins relies on Shotwell Mfg. Co. v. United States, 371 U.S. 341 (1963), which held that evidence of guilt induced from a person under a governmental promise of immunity must be

---

[8](...continued)
not deprive Hawkins of the ability to impeach her identification of him, because other statements of the victim, similarly introduced pursuant to this stipulation and not now challenged by Hawkins, independently established the victim's poor vision and hearing and the uncertainty of some of her recollections. Hawkins points to no further impeachment that he hoped to elicit from cross examination of the victim at trial that was not already in the record via her other statements.

excluded under the Self-Incrimination Clause of the Fifth Amendment, because a confession must be voluntary and not "'obtained by any direct or implied promises, however slight.'" Id. at 347 (quoting Bram v. United States, 168 U.S. 532, 542-43 (1897)).

The terms of Hawkins' plea agreement, as described by the prosecutor, were that Hawkins would testify against Daugherty and plead guilty to one count of rape, in exchange for the state's promise to drop all other charges. The plea agreement was subsequently withdrawn, the prosecutor explained, because "[i]t later turned out based on out of court statements by the defendant and by physical evidence shown in other witnesses, that Mr. Daugherty did not have a part in this action." (Trial Tr. 43.)

On collateral review, the Kansas Court of Appeals found no error in the admission of Hawkins' preliminary hearing testimony. The court reasoned that Hawkins was not entitled to rely on the plea agreement once he chose to testify "differently" than he first agreed. However, the court did not elaborate on how Hawkins' testimony at the hearing "differed" from his agreement.

The federal district court found that the admission of Hawkins' prior testimony raised concerns of fundamental fairness because the state was not only able to withdraw the plea agreement, but also put Hawkins at a disadvantage by using testimony given pursuant to a favorable deal. See Hawkins, 979 F. Supp. at

1404. See United States v. Calabrese, 645 F.2d 1379, 1390 (10th Cir. 1981) ("Because important due process rights are involved, plea negotiations must accord a defendant requisite fairness and be attended by adequate 'safeguards to insure the defendant what is reasonably due [in] the circumstances.'" (alteration in original) (quoting Santobello v. New York, 404 U.S. 257, 262 (1971))). Ultimately, the district court conceded that the issue may have presented a "'dead-bang' claim," but was unable to conclude that the claim would have resulted in reversal on direct appeal, given Hawkins' "uncontroverted breach"[9] of the agreement, the lack of an express grant of immunity, and the possibility that the error was harmless in light of other evidence before the jury. See Hawkins, 979 F. Supp. at 1404.

The state contends that Hawkins "breached" the plea agreement by testifying untruthfully. However, Hawkins never recanted his story on the record, and his defense strategy at trial, in part, was to suggest that Daugherty was the attacker. Aside from a comment by the prosecutor at the suppression hearing,[10] only the trial court's comment during Hawkins' state collateral challenge that

_____

[9]Like the Kansas Court of Appeals, the federal district court did not explain how Hawkins "breached" the agreement.

[10]At the suppression hearing, the prosecution commented to the court that Hawkins "did in fact admit that Mr. Daugherty had nothing to do with the case," and that the "plea bargain stopped at that time when he refused to testify against Mr. Daugherty."

"Mr. Hawkins, in effect, recanted his testimony by saying that [Daugherty] didn't commit the crime," supports the assertion that the testimony given at the preliminary hearing was untruthful.

Even if Hawkins <u>did</u> breach the agreement by giving untruthful or only partially truthful testimony, his breach – although it could render the agreement void – did not justify the admission of the statements against him at trial. The proper inquiry remains whether the statement was coerced in any way, and that question is "to be answered with complete disregard of whether or not petitioner in fact spoke the truth." <u>Rogers v. Richmond</u>, 365 U.S. 534, 544 (1961); <u>see also</u> <u>Shotwell</u>, 371 U.S. at 350 n.10 (where the offer of immunity is given in the context of an investigation or prosecution, the truth or falsity of the disclosure given is irrelevant to the question of its admissibility) (citing <u>Rogers</u>, 365 U.S. at 544).

Hawkins' position is precisely "that of a person, accused or suspected of a crime, to whom a policeman, a prosecutor, or an investigating agency has made a promise of immunity or leniency in return for a statement." <u>Shotwell</u>, 371 U.S. at 348. In such circumstances, "an inculpatory statement [is] the product of inducement, and thus not an act of free will." <u>Id.</u> Here, Hawkins was induced by a promise of leniency to give authorities incriminating statements, such that the statements could not be considered voluntary. As a result, the testimony was

admitted in violation of Hawkins' right against self-incrimination. See United States v. Escamilla, 975 F.2d 568 (9th Cir. 1992) (reversing conviction because of erroneous admission of defendant's confession at trial, where confession was given pursuant to plea agreement that was withdrawn by government). Accordingly, we find that counsel's failure to appeal this issue was deficient. We consider the potential prejudicial effect of this attorney error below.

### 4. Witness' Hearsay Statement

Hawkins next asserts that counsel was ineffective for failing to object at trial to Chief Sade's testimony that "an individual" told the police that Hawkins was in the vicinity of the crime scene. In addition, Hawkins claims that counsel further damaged the defense by eliciting the name of the informant during cross-examination of Sade. Assuming that counsel's failure to object to this hearsay and subsequent error on cross examination was deficient, Hawkins cannot show that this error was prejudicial, as he admitted to being at the scene of the crime in his 10:30 p.m. interview on March 29, as well as in his written statement to the police given March 30 – neither of which is challenged here. Thus, counsel was not constitutionally ineffective in this instance.

### 5. Fourth Amendment challenges

Finally, Hawkins claims that his counsel was ineffective in failing to raise at trial or on appeal any Fourth Amendment challenges to the state's evidence.

Hawkins contends that he was illegally detained on March 27, 1983 when he was brought to the police station to be photographed, and again when he was brought to the station for questioning on March 29 on the basis of the witness tip placing Hawkins in the vicinity of the crime scene. He argues that the court should have suppressed the fruits of these illegal detentions, including the photographs, the victim's subsequent photo identification of Hawkins, and Hawkins' audiotaped statements the night of March 29 in Neodesha and the morning of March 31 in Chanute.

Hawkins presented this claim in his § 2254 petition as an alternative ground for challenging the admission of the videotaped statements, and not as a separate instance of ineffective assistance. The district court did not comment upon the argument. Even assuming the issue (framed as a claim of ineffective assistance) has not been waived, it is meritless. Despite Hawkins' assertions to the contrary, there is no indication that Hawkins was "arrested" when he was photographed on March 27, 1983, and even if the witness tip failed to establish probable cause for Hawkins' detention on March 29, no incriminating statements were taken at that time. Moreover, Hawkins returned to the station voluntarily later that same evening because he wished to make a statement. Therefore, Hawkins' audiotaped statement given at 10:30 p.m. that night cannot be considered "tainted fruit" of an illegal detention. Finally, Hawkins voluntarily accompanied Chief Sade to

Chanute for the PSE test on the morning of March 31, and nothing indicates that his <u>Mirandized</u>, audiotaped statement, made immediately after the PSE, was in any way involuntary. Because this claim is meritless, Hawkins' counsel was not ineffective for failing to raise it.

<u>C. Prejudice under *Strickland*</u>

We have concluded that counsel was deficient in: (1) failing to appeal the admission of Hawkins' videotaped statements given March 31 in Neodesha; and (2) failing to appeal the admission of Hawkins' preliminary hearing testimony. We now must determine whether counsel's deficient performance was prejudicial.

Under the prejudice prong of <u>Strickland</u>, Hawkins must show that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Strickland</u>, 466 U.S. at 694. In evaluating prejudice under <u>Strickland</u>, we "must consider the totality of the evidence before the judge or jury." <u>Id.</u> at 695. That is, "[t]aking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." <u>Id.</u> at 696.

We first address the erroneous admission of Hawkins' preliminary hearing testimony and conclude that it was not prejudicial under <u>Strickland</u>, as the content of Hawkins' testimony did not differ materially from the version of events he initially provided to police in his written statement of March 30 (which Hawkins does not allege was improperly admitted at trial). In both statements, Hawkins claimed that Daugherty had committed the rape while Hawkins served as a lookout. Although the preliminary hearing testimony additionally placed Hawkins inside the victim's house where he claimed to have personally observed Daugherty on top of the victim, it cannot be said that the erroneous admission of this additional fact establishes a reasonable probability that, but for its admission, the jury would have reached a different conclusion with respect to Hawkins' guilt regarding the charges of aggravated battery, rape, and sodomy. Because the claimed error fails the prejudice prong of <u>Strickland</u>, counsel was not constitutionally ineffective for failing to raise the issue on appeal.

A more difficult issue arises in evaluating the possible prejudice resulting from the admission of the videotaped statements. We concluded above that Hawkins' interview in Chanute the morning of March 31 was admissible, but that his statements given at the county attorney's office in Neodesha in the two videotaped sessions on the afternoon of March 31 were obtained in violation of Hawkins' right to counsel. As noted, only the transcript of the audiotape – which

- 28 -

captured the morning interview in Chanute and a portion of the first of the two afternoon video sessions in Neodesha – remains in the record. The second video, which was played for the jury, was never transcribed, and we can only speculate as to its contents. However, it is clear from the transcript of the first afternoon session that Hawkins made very incriminating statements during this interrogation, including admitting that he struck the victim and orally sodomized her.

In order to evaluate the possible prejudice of counsel's error in failing to appeal the admission of these statements, we must be able to assess what evidence properly remained before the jury. The transcript of the audiotape, however, does not clearly reflect at what point the morning interview in Chanute (containing admissible statements) ended, and the afternoon interview (containing inadmissible statements) began. Most significantly, on page 176 of the trial transcript appear thirteen lines of statements which arguably belong to either session, and it is within these lines that Hawkins first admits to orally sodomizing the victim. We reprint these lines below (in bold) in context:

> Q      Lets get this all cleared up now Dana. Okay, lets clear it
> up now. We could end the investigation.
> A      I don't know, I don't know.
> Q      What was in the, this front room that you went into,
> what was there, can you describe the furniture, or the
> setting of the room?
> A      Hu uh.

Q    Was the sexual assault being, taking place on the floor, or on a couch?

A    On the floor I think.

Q    What did the old lady have on?

A    I don't know, I didn't notice.

Q    Did you pick up a knife while you were in there?

A    Not that I can remember.

Q    Did Robert pick up a knife?

A    I didn't see him.

Q    Dana, do you feel like that you raped the old lady?

A    I feel like I don't know.  How I feel like.

Q    Well, Dana, I cannot make you any promises of any sort, and I do not have any authority to do that, but I can tell you that if you will continue to cooperate in this investigation as you have, that should you become charged as a result of this I will do anything that I can to help you out.

A    I'll cooperate, cause I want to know.

Q    Okay, do you now want to, will you not consent to taking another PS[E] test in relation to the statements that you've just made.

A    I'll try.

Q    Okay, lets try it, and we'll talk again after PS[E] test. Okay. *That will end this portion of the this interview at 9:47 a.m. on the 31st day of March, 1983.*

**A    Well, wait a minute.  I didn't.**

**Q    What do you mean?**

**A    I didn't stick it in her.**

**Q    You didn't?**

**A    I stuck it in her mouth I think.**

**Q    Okay, all right.  Good, good.**

**A    I didn't stick it in her pussy.**

**Q    Getting it cleaned up.**

**A    She didn't bite me though.**

**Q    She didn't bite you – (inaudible.)**

**A    But I know I didn't stick it in her.**

**Q    Okay.**

**A    At the same time.**

UNIDENTIFIED SPEAKER: *We're back on tape now Dana.*

Q      (Mr. Sade) Okay, a few minutes ago Dana we ended a
       video taped interview after we sat and talked for a few
       moments.  It appeared to me that you were becoming
       upset, possibly as a result of your crying, and I at that
       point in time asked you what you could add to it.  I
       asked you to go ahead, lets clean it all up, lets get the
       whole truth out and you'll feel better.  Okay, at that time
       you told me that you had raped the old lady, is that
       correct?

A      Not in her, I didn't –

              UNIDENTIFIED SPEAKER: But now you
              remember it even more, you didn't rape her,
              why don't you tell us –

A      I didn't stick it in her pussy.

Q      (Mr. Sade) Okay, did you stick it in her rear end?

A      No.

Q      Did you stick your penis in her mouth?

A      Yeah.

Q      Okay.  Did she bite you?

A      Not that I – I ain't got no places on me.

Q      Okay.  Where and what part of the house were you at when you
       stuck your penis in her mouth?

A      I don't know.

Q      You don't recall.  Okay, where was Robert at at the
       time you stuck your penis in her mouth?

A      Well, I don't remember.

              UNIDENTIFIED SPEAKER: Was he in the apartment?

A      No.

Q      (Mr. Sade) Okay, had he been in the apartment?

A      Yeah, he was in there before I was.

(Trial Tr. at 175-77 (boldface and italics added).)

It is clear that everything prior to the statement (shown above in italics),

"That will end this portion of this interview at 9:47 a.m. on the 31st day of

March, 1983," was part of the morning session in Chanute.  It is also clear that

everything after the statement (shown above in italics), "We're back on tape now

- 31 -

Dana," was part of the afternoon session. What is ambiguous is when the intervening thirteen lines of transcript (shown above in bold) were recorded.

At oral argument before this court, Hawkins' counsel contended that the transcript indicated a break in the tape following the questioner's statement announcing the end of the interview at 9:47 a.m. Hawkins submits that all the following lines were part of the afternoon session, which we have concluded was an unconstitutional interrogation. The government conceded at oral argument that the transcript was ambiguous.

We believe it is impossible to resolve this ambiguity. One plausible reading might be that Hawkins' statement "Well, wait a minute," and the subsequent twelve-line exchange was an impulsive comment given just before Sade turned off the recorder. Another plausible reading is that the thirteen lines were recorded in the afternoon, given that these lines appear to be contextually unrelated to the foregoing discussion in the transcript, and given that the earliest lines following the statement, "We're back on tape now," (clearly recorded in the afternoon session) appear to refer back to the thirteen-line exchange. Specifically, Sade refers to a discussion that took place "a few minutes ago," in which Sade had asked Hawkins to go ahead and "let's clean it all up." Likewise, in these lines immediately following the disputed exchange, Hawkins reiterates that he "didn't stick it in her pussy."

We cannot discern from this transcript whether these critical thirteen lines formed part of the morning or afternoon questioning. However, even assuming arguendo that these lines were recorded as part of the afternoon session in Neodesha, and therefore were inadmissible, we believe that, in light of the totality of the evidence properly before the jury, Hawkins has not established a reasonable probability that, absent this evidence, the jury would have had a reasonable doubt respecting Hawkins' guilt. See Strickland, 466 U.S. at 695.

First, a Kansas Bureau of Investigation expert testified that head and pubic hairs found in the victim's bedding matched Hawkins' characteristics. Although the expert admitted that such evidence was not conclusive, he did testify that the ratio of persons with similar characteristics were 1 in 700 for the pubic hair, and 1 in 4,500 for the head hair. Next, a medical doctor testified that the victim suffered vaginal and rectal injuries. The victim's statements indicated that she was attacked by one man, and she identified Hawkins from a photographic lineup. Finally, even Hawkins' own statements were not unequivocally exonerating. Hawkins' story kept changing, as evidenced by his initial written statement, his preliminary hearing testimony, and the March 31 morning interview in Chanute (excluding the disputed 13 lines of transcript). Although Hawkins insisted initially that Daugherty committed the rape while he stood watch, he eventually admitted first that he had been inside the house, then that he entered her bedroom

and hit her with his fist.  Finally, during the morning interview in Chanute, when asked if he had raped the victim, Hawkins was ambivalent:

> Hawkins:   I just don't know.  Just don't know if I did it or didn't.
> Q.   Isn't that something that you would remember?
> A.   Yeah, if I did it, I think I'd remember it. Myself, I don't think I did it.
> Q.   Dana, if the old lady were to pick you out of a line up as the one who assaulted her, one who raped her, would she be correct in doing so?
> A.   She could be, because I don't know if I did or didn't.

(Trial Tr. 174.)

We conclude that, in light of this evidence properly admitted at trial, Hawkins has not shown a reasonable probability that, absent the videotape containing his outright admission that he sexually assaulted the victim, the jury's verdict would have been different.  Hawkins' defense therefore was not prejudiced by the admission of the videotape, and his counsel was not constitutionally ineffective for failing to challenge its admission on appeal.

## II. RIGHT TO CONFRONTATION

Hawkins independently claims that the stipulation to admit the victim's hearsay statements violated his right to confrontation.  The district court held that the Kansas Court of Appeals ruled this claim procedurally barred.  We agree.

On state collateral review, the Kansas Court of Appeals noted that under Kansas Supreme Court Rule 183, a collateral proceeding under Kan. Stat. Ann. §

- 34 -

60-1507 cannot ordinarily be used to review mere trial errors that should have been raised on direct appeal; however, the rule provides that "trial errors affecting constitutional rights may be raised even though the error could have been raised on appeal, provided there were exceptional circumstances excusing the failure to appeal." Kan. Sup. Ct. R. 183(c). The Kansas Court of Appeals noted that Hawkins claimed that his attorney's ineffective assistance constituted an "exceptional circumstance" for failing to raise the confrontation issue on direct appeal. However, the court of appeals concluded that Hawkins' counsel was not deficient in this regard and we agree. As such, we agree that the state procedural rule barring (absent "exceptional circumstances") issues from being raised in a collateral challenge that could have been raised on direct appeal properly served as the basis for the court's judgment, and agree with the district court that this issue was procedurally barred.

## CONCLUSION

We AFFIRM the district court's denial of relief under 28 U.S.C. § 2254.