**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**DEC 18 2000**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

TERRY LYNN NICHOLS,

    Defendant-Appellant.

No. 99-1438
(D.C. No. 96-CR-68-M)
(District of Colorado)

**ORDER AND JUDGMENT**[*]

Before **BALDOCK**, **PORFILIO**, and **BRORBY**, Circuit Judges.

In this appeal from a district court order denying him a new trial, Terry Nichols

contends either a whole new trial or an evidentiary hearing should have been granted by

the district court. The focus of Mr. Nichols' case is the failure of the prosecution during

trial to turn over some 40,000 Federal Bureau of Investigation "lead sheets." In addition

to the lead sheets, Mr. Nichols contends a post-trial letter to the district court from a

---

[*] This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel. This court generally disfavors the
citation of orders and judgments; nevertheless, an order and judgment may be cited under
the terms and conditions of 10th Cir. R. 36.3.

witness, Roger "Bob" Moore, casts doubt on Mr. Moore's trial testimony and makes reference to government interviews of Mr. Moore, reports of which were not turned over to the defense either. After a review of the record, we conclude Mr. Nichols' contentions are without merit, and affirm.

Mr. Nichols was convicted of conspiring to bomb the Alfred P. Murrah Federal Building in Oklahoma City, in violation of 18 U.S.C. § 2332a.[1] On direct appeal, this Court affirmed the convictions and sentence, and the Supreme Court denied certiorari. *United States v. Nichols*, 169 F.3d 1255 (10th Cir.), *cert. denied*, 528 U.S. 934 (1999).

In setting the issues for discussion raised by Mr. Nichols' post-trial motions, the district court described the universe of FBI reports compiled in this case as "'information control' sheets [.] informally called 'lead sheets'." The court then explained:

> Routinely, FBI agents and other FBI personnel use a standard form, in triplicate, to record received information that may possibly be relevant to an investigation, identifying the source, method, date and time of contact and a narrative summary of what was heard from the source. This form is also used to document communications between agents. Each lead sheet is given a control number and the form provides a space for reporting what investigative steps were taken as a result of the information received or the agent's message. The follow-up to the lead is an interview of the source or of others who may have more information, the agent conducting the interview will report what was said on a Form 302 if the information is thought to be relevant to the investigation or in the form of an "insert" if the information is of no apparent value.

---

[1] The facts of that crime are fully set forth in *United States v. McVeigh*, 153 F.3d 1166, (10th Cir. 1998); thus, they need not be repeated here.

Although all 302's and inserts were turned over by the government to the defense prior to trial, none of the more than 40,000 lead sheets were made available. Mr. Nichols claims he was unaware of their existence prior to an incident during trial, and the government does not contest this assertion.

At trial, during its rebuttal case, the prosecution called FBI special agent Chris Budke to testify about prior statements made by prosecution witness Richard Wahl, whose credibility was questioned by the defense. Agent Budke's testimony revealed he had made notes of his prior meeting with Mr. Wahl and these notes had not been reduced to a formal 302 or insert. This lead sheet purportedly reveals Mr. Wahl had made pre-trial statements which varied with his testimony. The district court ultimately admitted all Mr. Wahl's various prior statements into evidence, over the objections of the prosecution.

Mr. Nichols moved immediately to have Mr. Wahl's testimony stricken in its entirety, for the government to produce any other lead sheets, and for a mistrial. These motions were denied.

After the close of evidence, Mr. Nichols requested an evidentiary hearing on the lead sheets. He later moved for the production of the lead sheets for review by the defense or alternatively for an *in camera* review or review by government counsel. Meanwhile, the government was sorting the 40,000 lead sheets into three categories: 1) purely internal "agent-to-agent" communications; 2) lead sheets reflecting witness statements concerning the identity or location of persons resembling the John Doe #1 or

John Doe #2 sketches circulated after the bombing; 3) all other lead sheets. The last category was reviewed by government counsel.

Mr. Nichols again moved for a new trial or an evidentiary hearing, but both were denied. The court, however, did order the government to produce the roughly 12,000 lead sheets that fell into the category of "all other lead sheets" for Mr. Nichols' review after sentencing. On June 4, 1998, the government complied and produced a total of 13,998 pages. The district court's review of these sheets forms the basis of Mr. Nichols' request for a new trial. He also claims the withheld lead sheets violated the government's obligations under the federal rules of discovery, the Jenks Act, and the parties' discovery agreement.

Although the denial of a motion for a new trial is generally reviewed for an abuse of discretion, where "a new trial motion is based on an alleged ***Brady***[2] violation," this Court will "review the district court's ruling *de novo*." ***United States v. Quintanilla,*** 193 F.3d 1139, 1146 (10th Cir. 1999). The same standard is applied to the decision of whether the undisclosed evidence was material. ***United States v. Hughes,*** 33 F.3d 1248, 1251 (10th Cir. 1994).

Due process requires prosecutors to disclose "evidence favorable to the accused . . . where the evidence is material either to guilt or to punishment." ***Brady,*** 373 U.S. at 87. To establish a violation of ***Brady***, Mr. Nichols must show evidence was: 1)

---

[2]***Brady v. Maryland***, 373 U.S. 83 (1963).

suppressed by the prosecution; 2) favorable to him; and 3) material. *Johnson v. Gibson,* 169 F.3d 1239, 1254 (10th Cir. 1999).

The prosecutors' duty to avoid suppression is an active one. It includes "a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley,* 514 U.S. 419, 437 (1995). Moreover, the obligation to turn over evidence "stands independent of the defendant's knowledge." *Banks v. Reynolds,* 54 F.3d 1508, 1517 (10th Cir. 1995).

Evidence favorable to the accused includes exculpatory evidence, other information that provides important investigative leads, and impeachment evidence. *See Banks,* 54 F.3d at 1517, n.18 (exculpatory evidence); *Smith v. Secretary of New Mexico Dept. of Corrections,* 50 F.3d 801, 829 (10th Cir. 1995) (information providing investigative leads); *United States v. Bagley,* 473 U.S. 667, 676 (1985) (impeachment evidence).

In judging materiality, the focus must be on the cumulative effect of the withheld evidence, rather than on the impact of each piece of evidence in isolation. *Banks*, 54 F.3d at 1516. The cumulative effect of withheld evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles,* 514 U.S. at 433. Reasonable probability is not to be read as a requirement the defendant show by a preponderance of the evidence he would have been acquitted, *id.*, instead, "significant possibility would do

better at capturing the degree to which the undisclosed evidence would place the actual result in question, sufficient to warrant overturning a conviction or sentence." *Strickler v. Greene*, 527 U.S. 263, 298 (1999) (Souter, J. concurring).

Ultimately, the policy animating *Brady* is the desire to ensure a fair trial and a verdict worthy of confidence. *Kyles*, 514 U.S. at 434. Thus, the key issue is whether the government's evidentiary suppression undermines confidence in the outcome of the trial. *Id.*

In making his *Brady* argument, Mr. Nichols asserts some 219 of the 12,000 lead sheets handed over to the defense contain information directly relevant to issues tried in the case yet not turned over to the defense prior to trial. Mr. Nichols does concede, however, most of this information was available in FBI 302's and inserts turned over to the defense. His motion for a new trial focuses on 62 lead sheets he contends were exculpatory, directly relevant, and never turned over in any form. The lead sheets in question can be broken down into several categories: 1) those concerning the existence of a John Doe #2; 2) those concerning Timothy McVeigh's contacting known militia groups; 3) those concerning Michael Fortier; and 4) other miscellaneous lead sheets. We shall review separately these categories and their attendant issues.

## A. JOHN DOE #2

Many of the lead sheets relied on by Mr. Nichols contain information about a possible additional conspirator known as "John Doe #2" (JD2). These lead sheets

generally identify witnesses who claim to have seen Mr. McVeigh and JD2 together, at motels, at sandwich shops, truck stops, or other restaurants, buying stereo speaker wire, driving, or shopping, for example. Some sheets place JD2 in Oklahoma City at the time of the bombing. Others link JD2 to Kingman, Arizona, where Michael Fortier lived, including one from a caller claiming to have worked with McVeigh and JD2 at a security firm. Finally, one sheet claims JD2 was a member of McVeigh's former army unit, and one states JD2 was with McVeigh in Ohio a year earlier when McVeigh talked of blowing up a building.

Mr. Nichols argues these lead sheets point to the existence of conspirators other than himself who aided Mr. McVeigh and cast doubt on Mr. Nichols' participation in the overt acts which lead to his conspiracy conviction. At the very least, Mr. Nichols asserts, the presence of other conspirators at key points in Mr. McVeigh's plan casts doubt as to the extent of Mr. Nichols' involvement and his knowledge of Mr. McVeigh's ultimate aims, thus diminishing his culpability.

The government asserts many of these lead sheets were cumulative with information handed to the defense through FBI 302's and inserts. The information not already contained in other materials, or cumulative with other materials, was unreliable, unimportant, unverifiable, and largely implausible. Thus, the government believes the lead sheets to be too speculative to require disclosure under *Brady*. *Moore v. Illinois,* 408 U.S. 786, 795 (1972). The government also contends the defense was given such

copious amounts of JD2 evidence, and spent such a great deal of time presenting this evidence at trial, any other evidence would have been of no consequence to the outcome.

Most of the government's assertions here are not entirely convincing. Some of the lead sheets discussed appear to contain information not given to the defense in any other form. Also, the assertions of unverifiability, implausibility, and unimportance, smack of judgments best not left to the government when deciding *Brady* issues. Questions of credibility are properly for the jury, not for the prosecution, and the defense should be entitled to its own judgment of the utility of any exculpatory information. *See Buehl v. Vaughn*, 166 F.3d 163, 181 (3d Cir. 1999) (concluding in *Brady* context, government's argument the witness' withheld statement could not be verified "misses the point"). Finally, some of the government's assertions of cumulativeness ring hollow because it is at least arguable the defense could be aided by more rather than fewer similar sightings of JD2 with Timothy McVeigh.

Nevertheless, the government's alternative argument is more persuasive. The prosecution contends none of the withheld JD2 information provides a reasonable chance of changing the outcome, and we agree.

First, despite the lack of the lead sheets Mr. Nichols presented a great deal of JD2 evidence at trial. While the additional information may have provided added weight to the defense, the jury certainly had ample opportunity to consider the existence and possible role of an additional or alternative conspirator. In light of the evidence presented

to the jury, the undisclosed evidence is simply nothing more than chaff to be processed by the finders of fact. When considered with the whole of the evidence, the undisclosed statements bear insufficient probative value to suggest, if disclosed, they reasonably would have changed the outcome.

Second, none of the JD2 evidence casts doubt on the overt acts committed by Mr. Nichols. While the defense maintains the evidence points not just to additional conspirators, but to alternative conspirators, this is argumentative at best. None of the lead sheets contend someone else committed any acts the evidence attributed to Mr. Nichols. Nor do the sheets cast doubt on the extent of his role because it was conceded he did not actually deliver the bomb with Mr. McVeigh. We simply cannot agree the existence of another participant reduces Mr. Nichols' relative culpability.

Even proof of the existence of a real John Doe #2 and of his participation would not contradict the government's indictment. It must be remembered the indictment charged Mr. Nichols conspired with Mr. McVeigh and with others unknown. The participation of another conspirator disclosed by the evidence, therefore, does not relieve Mr. Nichols of culpability under the indictment. Thus, there is no reason to believe withholding this information from the defense violated Mr. Nichols' right to a fair trial.

### B. MILITIA GROUPS

Mr. Nichols also argues several lead sheets show Mr. McVeigh had connections to militia groups that did not include Mr. Nichols. While Mr. Nichols refers to a number of

lead sheets showing a connection between McVeigh and others and several militia groups, he does little to argue these are exculpatory. Apparently, he relies on the inference that Mr. McVeigh was reaching out to others; therefore, Mr. Nichols' participation was diminished or had ceased to exist. If we correctly interpret his argument, we think it lacks substance.

Mr. Nichols contends two sheets in particular are key, one claiming Mr. McVeigh visited the founder of the Elohim City group the week before the bombing, and another showing a call from Mr. McVeigh to a leader of the group on April 5, 1995. (The latter call was documented in phone records turned over to the defense by the FBI.). The visit to the Elohim City compound is at odds with testimony placing Mr. McVeigh at a Kansas motel at the same time, but even if true, does little to advance Mr. Nichols' cause. Were these facts made known to the jury, we believe the verdict would have been the same because any contact between Mr. McVeigh and various militia groups does not diminish Mr. Nichols' own participation in the conspiracy.

C. MICHAEL FORTIER

Mr. Nichols identifies several sheets which he says contain information that could have been used to impeach Mr. Fortier. In one lead sheet, a witness claims a customs agent said she had seen Mr. Fortier inside the Murrah Building with Mr. McVeigh (Mr. Fortier admitted to the trip in question but maintained he and Mr. McVeigh remained in the car.). In a second, the same story is offered by a man who claims his wife saw Mr.

McVeigh in the building. Another lead sheet involved a witness claiming he had a friend who had an acquaintance who knew Mr. Fortier well, and the acquaintance said Mr. Fortier once worked for a company that experienced a theft of explosives after which Mr. Fortier did not return to work. A different sheet is an inter-agent account of Mr. Fortier's own assertion someone had told him Mr. McVeigh had purchased racing fuel at a track in the Kingman area. Finally, others concern: the stresses in Mr. Fortier's family after the bombing, his having had Mr. McVeigh as his best man, and his involvement with illegal drugs.

Several of these sheets contain information well known to Mr. Nichols because it was contained in other materials handed over by the prosecution, notably the information on Mr. Fortier's family situation, his closeness with Mr. McVeigh, and his prior drug involvement. Withholding these sheets then presents no ***Brady*** issue. On the question of Mr. Fortier's trip inside the Murrah Building, Mr. Nichols never had the hearsay reports, however, the prosecution did hand over two FBI interviews with the actual witness. In these interviews, the witness positively identified one man as Mr. McVeigh, but was unsure whether the other was Mr. Fortier. While Mr. Nichols claims the positive identification contained in the lead sheets would have made a difference, the argument becomes problematical when the evidence shows the witness could not make such an identification. Moreover, the hearsay account that places Mr. McVeigh in the building is redundant with the actual witness's account and does little to further Mr. Nichols' case.

Although the tale of the explosive theft is intriguing, its probative value is insignificant because it is third or fourth-hand hearsay. Even if true, the story casts little doubt on Mr. Nichols' participation in the activities of which he was accused, nor does it add to the extensive impeachment Mr. Fortier underwent at trial. Finally, the information Mr. McVeigh may have purchased some amount of racing fuel at a racetrack does not cast doubt on Mr. Nichols' activities, nor does it impeach Mr. Fortier. The trial court correctly observed the follow-up investigation revealed no racetrack in the area sold fuel. Taken as a whole, none of the information about Mr. Fortier could have added significantly to the impeachment he underwent at trial.[3]

## D. MISCELLANEOUS LEAD SHEETS

Mr. Nichols also relies on several lead sheets about other issues. Only a few of these sheets contain information not handed to the defense in more formal FBI 302's or inserts. The remainder appear not exculpatory, including: 1) a report that parking in front of the Murrah Building was difficult to obtain at nine in the morning, suggesting an accomplice would be needed to hold a spot for the Ryder truck; 2) a report from someone saying she had known Mr. Nichols and his family some twenty years ago; and 3) a report Mr. McVeigh and "Bob Jacks" inquired into buying land in Missouri. Nonetheless, one sheet deserves special mention. There is a report Mr. McVeigh purchased 50 bags of

---

[3]Mr. Fortier admitted extensive criminal conduct, and the district court instructed the jury to use "great care" and "caution" in considering his testimony.

ammonium nitrate fertilizer in Oklahoma City on April 1, 1995. This report is contradicted by evidence Mr. McVeigh was at a Kingman motel from March 31-April 7, 1995. Nevertheless, even if true, the story does not relieve Mr. Nichols from responsibility for the earlier purchase with Mr. McVeigh of 4,000 pounds of ammonium nitrate.

## E. LEAD SHEETS CONCLUSION

While Mr. Nichols correctly points out the *Brady* analysis must focus on the cumulative effect of the withheld evidence rather than on each piece of evidence in isolation, he is not correct that the government's analysis of each lead sheet is wrong-headed. It may be true on occasion the total is greater than the sum of the parts, but rarely can one add a column of zeroes to get a positive result. The government has shown a great deal of the information Mr. Nichols claims was wrongfully withheld was already in his possession. It has shown the rest of the information was highly unlikely even in the aggregate to sway the outcome of the case. None of the materials poses a reasonable probability, had the evidence been disclosed to the defense, the result of the proceeding would have been different.

## F. ROGER MOORE'S LETTER

Mr. Nichols relies on Mr. Moore's post-trial letter to the district court as a basis for a new trial. Mr. Nichols does not claim the letter was withheld in violation of *Brady*; indeed, the letter was not written until after the trial. Instead, Mr. Nichols presents two

reasons for the letter's importance: 1) it provides details that differ from Mr. Moore's prior testimony, and 2) it suggests interviews the FBI conducted with Mr. Moore, the records of which were not turned over to the defense.

For the assertion the letter contains new contradictions with Mr. Moore's trial testimony; Mr. Nichols has failed to detail them. Further, were such contradictions shown, they do not qualify as newly discovered evidence.

To support a new trial motion, Mr. Nichols had to show: 1) the evidence was discovered after trial; 2) the failure to learn of the evidence was not caused by his own lack of diligence; 3) the new evidence was not merely impeaching; 4) the new evidence is material to the principle issues involved; and 5) the new evidence is of such a nature that in a new trial it would probably produce an acquittal. *Quintanilla,* 193 F.3d at 1147. Mr. Nichols has failed to convince us of the existence of the third and fifth conditions. There is no basis for a new trial here.

## G. DISCOVERY AGREEMENTS, JENKS ACT, RULES OF DISCOVERY

Mr. Nichols also bases his claim for a new trial on the interests of justice because the government's withholding of the lead sheets violated the federal rules of discovery, the Jenks Act, and the parties' discovery agreement. These claims, even if not time-barred, are without merit.

The parties argue vigorously whether Mr. Nichols' motion should be considered to be preserved beyond the seven-day bar imposed by Rule 33 on new trial motions. In all,

while the government seems to have the better of this argument, Mr. Nichols is right to point out he has objected to the failure to hand over the lead sheets at every conceivable time and in every manner. Because of the lack of substance to this matter, however, we need not resolve this thorny procedural issue.

The government's failure to turn over the lead sheets is perfectly in accord with the rules of discovery because the sheets were reports made by government agents investigating the case and thus came under the heading "Information not Subject to Disclosure." Fed. R. Civ. P. 16(a)(2). The lead sheets were not subject to the Jenks Act because they were not relevant statements made by a testifying witness called by the prosecution. 18 U.S.C. § 3500 (a)(b)(e); Fed R. Crim. P. 26.2(a, f). The defense concedes the lead sheets were not covered by the discovery order (because they did not know about them), and the parties oral agreement did not cover interview notes as opposed to memoranda or other summaries of interviews. Thus, it appears in no way does the government's withholding the lead sheets violate any obligation it had to Mr. Nichols.

## H. EVIDENTIARY HEARING

As an alternative to his motion for a new trial Mr. Nichols asks this Court to order an evidentiary hearing in the district court on the lead sheets and Mr. Moore's letter.[4] We

---

[4] Specifically, Mr. Nichols requested a hearing to: complete the record with testimony under oath concerning how the lead sheets were generated; where they were kept; how they were redacted; how the government decided which ones to turn over under

(continued...)

review the decision of the trial court on the propriety of the evidentiary hearing for an abuse of discretion. *United States v. Nichols*, 169 F.3d 1255, 1263 (10th Cir. 1999). Because this is a very high standard to meet, we should only set aside the district court's judgment if it is "arbitrary, capricious, whimsical, or manifestly unreasonable." *Coletti v. Cudd Pressure Control*, 165 F.3d 767, 777 (10th Cir. 1999).

On its face there is nothing manifestly unreasonable about the district court's decision. The two categories of lead sheets that are not available to Mr. Nichols contained inter-agent communications, and lay opinions on the possible identities of John Doe #1 and #2. *Brady* does not authorize defense counsel's own search of the government files to argue relevance. *Pennsylvania v. Ritchie*, 480 U.S. 35, 59 (1987). While the district court might have exercised its discretion to take testimony on some of these matters, it clearly was not a whimsical decision on its part not to do so. We therefore decline Mr. Nichols' invitation to mandate an extension of these proceedings.

**AFFIRMED**.

ENTERED FOR THE COURT

---

[4](...continued)
the court's order; what records the government kept of its lengthy interrogations of Roger Moore and Karen Anderson; what financial arrangement the government had with Roger Moore and Karen Anderson and what, if any, role the Attorney General and the President had in that arrangement; and how the defense would have used the withheld information if it had been timely and properly provided.

John C. Porfilio
Senior Circuit Judge